(No. 55057.—

LILLIAN BENSON, Appellee, v. THE INDUSTRIAL COMMISSION *et al.* (The Board of Education of the City of Chicago, Appellant).

*Opinion filed June 1, 1982.—Rehearing denied October 1, 1982.*

Michael J. Murray and Patricia J. Whitten, of Chicago (Reginald D. Taylor, of counsel), for appellant.

J. Michael Madda, of Chicago (Charles Wolff, of counsel), for appellee.

JUSTICE SIMON delivered the opinion of the court:

At 1 p.m. on Monday, September 13, 1976, an ordi-

nary workday, Jack Benson collapsed and fell to the floor while at work cleaning a disc with a steel brush and kerosene. Artificial resuscitation failed to revive him, and he died shortly after being taken to a hospital. No autopsy was performed, and the precise cause of his death remained uncertain throughout this litigation. His widow brought a claim for workmen's compensation. The arbitrator concluded that the injury was compensable, but the Industrial Commission reversed, finding no causal connection between Benson's employment and his death. The circuit court of Cook County, hearing the case on writ of *certiorari*, reversed the decision of the Industrial Commission and reinstated the arbitrator's award. The Chicago board of education, Benson's employer, appealed to this court pursuant to Rule 302(a)(2) (73 Ill. 2d R. 302(a)(2)).

At the time of his death, Jack Benson was 55 years old and had been employed steadily by the board of education as an engineer-custodian for approximately 17 years. His tasks were multifarious and apparently included whatever had to be done to put the premises of the Mayfair School, to which he was assigned at the time of his death, in order. The Mayfair School building consisted of a basement and three floors and occupied half a city block, with the school grounds occupying the other half. The building did not have elevators, so that anyone going from one floor to another had to use the stairs. Benson's wife, while not an employee of the board of education, nonetheless followed the practice of accompanying her husband to work and helping him with his job. She was with him on the day of his death.

On the morning of his death Benson and his wife arrived at the school at 8 a.m. Benson's first task that morning was to walk around the perimeter of the premises and inspect the property for vandalism; this took almost half an hour. Next he inspected the interior of the building,

traversing each of the four floors. This took another half hour. Then he went to the basement to remove and clean nine discs in the boiler. The discs were only two inches in diameter and half an inch thick, but it took a fair amount of force to remove them from the boiler, according to Mrs. Benson's testimony, and could only be removed by using a heavy wrench.

While Benson was working to remove the discs, a newly appointed janitor reported for work, and Benson spent the next hour showing him around upstairs and explaining what he was to do. He then resumed his task of removing the discs but was interrupted again by a second new janitor, whom he also showed around upstairs. Benson took a half-hour lunch break at noon, eating with his wife in the school basement, and then went back to cleaning the discs, a task which involved removing encrusted deposits and polishing the discs. Each disc took about 20 minutes to clean and required vigorous scrubbing with sandpaper, a steel brush and kerosene. As Benson sat on a stool scrubbing the discs, he collapsed to the floor with no warning. He died that day, apparently without regaining consciousness.

Benson was 5 feet 5 inches tall at the time of his death, weighed 220 pounds, and had no history of any heart disorders. The medical evidence shows, however, that he was hospitalized for treatment for a hiatal hernia in 1968, at which time he was off work for a week. Benson received periodic treatment for an inguinal hernia thereafter, and wore a truss for an unspecified period of time. The only other piece of tangible medical history derives from one of several visits Benson made to the Portes Cancer Prevention Clinic in 1974, two years before his death. The clinic's report stated that Benson felt occasional dull chest pains which lasted for several minutes, occurred mostly at night, and were accompanied by an awareness of heartbeat. This had been going on for slightly more

than three years. The report noted, however, that the heartbeat felt abnormally rapid on only two occasions, and it indicated that Benson's blood pressure and weight were generally normal. The report further stated that the chest pains often occurred after Benson had eaten a big meal or consumed "gassy foods," and it noted other kinds of discomforts, among them inguinal hernia, hiatus hernia and ulcers. In addition, the report noted one episode of syncope, or sudden loss of consciousness.

Two medical experts testified at the arbitration hearing, one for each side. Claimant's witness, Dr. Stanley B. Wissner, gave his opinion in response to a hypothetical question that Benson was suffering from congestive heart failure at the time of his death and that the actual cause of death was a heart attack. He based this conclusion on the Portes Clinic reports of recurring chest pain and fast heartbeat, which he diagnosed as tachycardia, and of syncope, which he ascribed to cardiac rather than to intercerebral sources because the electroencephalogram in the wake of the syncope was normal. He further offered the opinion that the heart attack "could well" have been precipitated by Benson's exertion on the job. On cross-examination, he admitted that the normality of the electroencephalogram did not necessarily rule out the possibility of an intercerebral disorder at the time of either the earlier syncope or the later attack, and that walking or any other form of exertion could conceivably cause death to a person with the cardiac condition he diagnosed Benson as having had, although light exertion was less likely to cause death than strenuous exertion. He also conceded on cross-examination that obesity could have been a factor in Benson's heart failure, as he weighed over 200 pounds, and Dr. Wissner admitted that he did not know how much force was actually necessary to remove and polish the discs on which Benson was working at the time of his death.

Dr. William B. Buckingham, the school board's wit-

ness, gave his opinion that the specific cause of Benson's death was impossible to determine on the basis of the known facts, and that the work Benson did on the day of his death bore no relationship to any of the possible causes of death. The possible causes enumerated were a cerebral hemorrhage, a dissecting aneurysm of the aorta, or a ventricular tachycardia and fibrillation; only the latter two of these were heart related, but all of them, the witness asserted, were possible diagnoses given the medical history of Benson and the fact that he died without any premonitory symptoms of an attack. Dr. Buckingham stated that a cerebral hemorrhage could not be precipitated by the work Benson performed, and this assertion was not challenged on cross-examination. When cross-examined on his statement that it was unlikely that Benson's exertion on the day he died could have precipitated his death if it was caused by an aneurysm or by ventricular fibrillation, he stated that a person with a congenital defect or a preexisting degeneration of the media of the aorta could work as a janitor and do the work Benson did on the day of his death without adverse consequences. He said that whether there was a correlation between blood pressure and the rupture of a defective wall of the aorta could not be answered "yes" or "no," that climbing three flights of stairs of a school building could either raise or lower a person's blood pressure, and that he could not tell whether an increase in blood pressure might render an individual more vulnerable to rupture of a dissecting aneurysm without knowing what the blood pressure had been both before and after it rose. He reiterated his doubts that physical activity alone could cause ventricular fibrillation. However, he said it is theoretically possible that increased demand for oxygen by the heart muscle can cause ventricular fibrillation, and this in turn might be brought on by an increase in physical exertion. While he expressed no opinion as to whether Benson's activity could have led to

such an increase in demand for oxygen, he agreed that "[i]f the work activity of the heart [is] two to three times the resting work activity and the onset [of the attack] occurred during the increased activity, ***" he might conclude that there was a relationship between the two, but he noted that this would depend on the circumstances of the individual.

The issue before us on this appeal is whether the Industrial Commission's decision that the claimant had failed to demonstrate a connection between Benson's death and his employment was against the manifest weight of the evidence. The arbitrator's conclusion and the circuit court's differed, of course, from that of the Industrial Commission. However, the test of whether the Commission's decision was supported by the manifest weight of the evidence is not whether the reviewing court or any other tribunal might reach the opposite conclusion on the same evidence, but whether there was sufficient factual evidence in the record to support the Commission's decision (*A. O. Smith Corp. v. Industrial Com.* (1977), 69 Ill. 2d 240).

In this case the medical evidence was so sparse that the Industrial Commission could have concluded that the cause of death had not been proved. No autopsy was performed, and there was no clear evidence that Benson did or did not have any physical disorder other than a hernia before he fell dead. The medical evidence raises the possibilities that Benson at the time of his death was suffering from congestive heart disease, an aortic aneurysm, a noncongestive disorder relating to the heart muscle, a cerebral condition unrelated to the heart but leading to the danger of hemorrhage, hernias, a combination of any of the above problems, or no disorder at all. Against this background, the two medical experts presented different interpretations of what had happened, one claiming that Benson had most likely died of a heart attack, but saying

nothing more specific, while the other stated that it was impossible to tell whether heart, circulatory or cerebral failure caused the death. If the Industrial Commission chose to agree with Dr. Buckingham that the cause of death could not be determined on the basis of the available evidence, or at least was not clearly a heart or circulatory disorder, we cannot say that the weight of the evidence does not support its choice. On the basis of that conclusion, claimant would not be entitled to compensation, since all her attempts to prove a connection between the death and her husband's work revolved around proof that the exertion it required caused or precipitated a heart or circulatory failure. The Workmen's Compensation Act (Ill. Rev. Stat. 1977, ch. 48, par. 138.2) requires at a minimum that claimant show that the injury arose out of the employment (*County of Cook v. Industrial Com.* (1977), 68 Ill. 2d 24, 30; *A. O. Smith Corp. v. Industrial Com.* (1965), 33 Ill. 2d 510, 513) and that it was attributable to a "definite *** cause" (*Laclede Steel Co. v. Industrial Com.* (1955), 6 Ill. 2d 296, 300). The Commission could have concluded that the evidence offered by the claimant failed to prove either, and its conclusion that there was no causal connection shown between Benson's employment and his death was supported by the evidence. For that reason we reverse the circuit court's judgment and affirm the order of the Industrial Commission.

*Judgment reversed;*
*order affirmed.*