INTER-CITY PRODUCTS CORPORATION, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (David Wright, Appellee).

Fifth District (Industrial Commission Division)   No. 5—01—0014

Opinion filed November 19, 2001.—Rehearing denied December 19, 2001.

Evans & Dixon, L.L.C., of St. Louis, Missouri (Deanna L. Litzenburg, of counsel), for appellant.

Hanagan & Dousman, of Mt. Vernon (Brian T. McGovern, of counsel), for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:

The claimant, David Wright, filed an application for adjustment of claim under the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1989, ch. 48, par. 138.1 *et seq.*) seeking benefits for injuries he allegedly received while in the employ of Inter-City Products Corp. (Inter-City). The Industrial Commission (Commission) awarded the claimant temporary total disability (TTD) benefits for a period of 8²/₇ weeks ending on September 24, 1991, and permanent partial disability (PPD)

benefits for 5% of a man as a whole and ordered Inter-City to pay $260 in medical expenses. On review, however, the circuit court of Randolph County set aside the Commission's decision and remanded the case to the Commission. On remand, the Commission issued a decision in which it awarded the claimant TTD benefits for a period of $200^{6}/_{7}$ weeks, PPD benefits for 25% loss of a man as a whole, and $33,425.70 in medical expenses. On Inter-City's petition for judicial review of the Commission's post-remand decision, the circuit court confirmed the decision. Thereafter, Inter-City filed the instant appeal.

The following factual recitation is taken from the evidence presented at the arbitration hearing conducted on August 29, 1995.

The claimant was hired to work for Inter-City's predecessor, Snyder General, as a coil bender on or about May 20, 1991. His duties required that he roll coils for heat pumps and air-conditioning units into circles. The claimant testified that some of the coils that he was required to lift weighed up to 70 pounds. After the plant was sold to Inter-City, the claimant continued working there in the same capacity.

According to the claimant, he never had problems with his shoulders or neck prior to being employed by Snyder. After he began working for Snyder, he started to experience an aching in his left shoulder. He recalled an incident in June 1991 when, as he was lifting a coil, he "felt something like a rubber band" in between his neck and his shoulder and stated that he "knew then that something was wrong." On July 24, 1991, several weeks after the plant had been sold to Inter-City, the claimant noticed that his neck, shoulder, arm, and thumb were hurting and that he was unable to keep up with the pace of his normal duties.

On July 29, 1991, the claimant saw his family physician, Dr. Craig W. Furry, complaining of aching in his left shoulder which developed at work. Dr. Furry noted tenderness in the claimant's left shoulder and diagnosed a left shoulder strain. He gave the claimant a slip authorizing him to take off work and scheduled a return visit in 10 days.

When the claimant returned to see Dr. Furry on August 9, 1991, he complained of pain from his left shoulder to his elbow. Although Dr. Furry found no tenderness to palpation, he noted a possible cervical radiculopathy and ordered X rays of the claimant's cervical spine. Those X rays, taken on August 10, 1991, revealed a minimal narrowing of the C5-C6 intervertebral space and localized cervical osteoarthritis. According to the X-ray report, no evidence of fracture, dislocation, metastatic destruction, or other significant degenerative change was detected.

The claimant next saw Dr. Furry on August 16, 1991. At that

time, he complained of tingling in his left shoulder. Dr. Furry ordered a CT scan of the claimant's cervical spine and recommended that he begin physical therapy. The report of the CT scan, taken on August 19, 1991, notes degenerative spurring involving the left posterior lateral joint between C5 and C6 and states that the possibility of a protruding disc at C5-C6 could not be ruled out, since the protrusion could be obstructed by the degenerative process.

The claimant began physical therapy on August 19, 1991. According to the hospital records, on that date, the claimant gave a history of soreness in his left shoulder which began after he started to work for Snyder. He reported a tingling in his shoulder and an aching from the shoulder to the elbow. The claimant attended 12 physical therapy sessions between August 19 and September 17, 1991, and received treatments which included cervical traction, ultrasound, and megatherm.

The claimant saw Dr. Furry on August 23, 1991, at which time Dr. Furry noted that the claimant's CT scan showed no evidence of a disc problem and referred the claimant to Dr. Robert E. Schultz, Sr., a neurosurgeon.

The claimant next saw Dr. Furry on September 11, 1991. Dr. Furry's note of that visit reflects that the claimant reported pain which was localized in his left shoulder but which did not radiate down his arm. The claimant did not complain of numbness in his arm or finger but did complain of continuing tingling and achiness in his neck and left shoulder.

Dr. Schultz examined the claimant on September 24, 1991, and recorded his impressions as: "C6 radiculopathy—left upper extremity" and "Degenerative disc disease—C5-6." He gave the claimant a prescription for a cervical traction apparatus and prescribed Naprosyn. In his report to Dr. Furry, Dr. Schultz noted his recommendation that the claimant have an EMG and a nerve conduction study of both upper extremities. The tests were never done, however, due to claimant's refusal to have any test which involved needles.

On September 25, 1991, Inter-City terminated the claimant's benefits after the claimant ignored a request by Inter-City's insurance carrier that he see a doctor of its choosing. Thereafter, the claimant received no further medical treatment until August 24, 1992.

At the request of Inter-City, Dr. Daniel Phillips, a board-certified neurologist, examined the claimant on January 9, 1992, and reviewed his CT scans and X rays. According to Dr. Phillips, the claimant related that he began experiencing soreness and left shoulder pain radiating down his arm about one month after he started work as a coil bender but did not report any specific injury. During the examination, the claimant complained of neck and shoulder pain and an ach-

ing in his thumb and reported that his hand feels "funny" at times. Dr. Phillips testified that, during the physical examination, the claimant demonstrated full range of motion in the cervical spine, left shoulder, elbow, and wrist. He stated that the claimant's left arm pain did not give a clear dermatomal type of reading as might be expected with a radiculopathy and that he found normal strength, no muscle spasm, intact sensation, and equal reflexes. Dr. Phillips further testified that his review of the claimant's X rays and CT scan revealed a small spur at C5-C6 on the left with some bilateral narrowing at C5-C6. According to Dr. Phillips, a spur is a chronic condition and "wouldn't be related to his [the claimant's] work." Based upon his examination of the claimant and his review of the claimant's CT scan and X ray, Dr. Phillips concluded that the claimant was capable of working without restrictions and had no residual disability.

The claimant returned to see Dr. Furry on August 24, 1992. According to Dr. Furry's notes of that visit, the claimant informed the doctor that his lawyer had asked him to return. At the August 24 visit, the claimant complained of stiffness in his left arm, left shoulder, and neck. Dr. Furry prescribed medication and referred the claimant back to Dr. Schultz for further evaluation.

On November 5, 1992, the claimant returned to Dr. Furry complaining of pain and stiffness in his neck extending into his left arm.

When the claimant saw Dr. Schultz on November 10, 1992, he reported that he experienced some improvement when he used the cervical traction apparatus but that his symptoms returned when he stopped using the apparatus. He also reported having discontinued the use of Naprosyn as it made him sick. The doctor changed the claimant's medication and recommended evoked potential testing, which the claimant underwent on November 17, 1992. The testing revealed bilateral abnormal dermatomal potentials at C6 and C7 with greater involvement on the left than on the right and borderline abnormal dermatomal potentials at the right of C5.

During his January 5, 1993, visit to Dr. Schultz, the claimant reported that he was still experiencing pain. In correspondence to Dr. Furry dated that same day, Dr. Schultz observed that all conservative measures had failed and that he was referring the claimant to an anesthesiologist for trigger point injections. The record reflects that the claimant never had the injections and that he never returned to Dr. Schultz for further treatment.

The claimant was reexamined by Dr. Phillips on March 16, 1993. Dr. Phillips testified that the claimant complained of pain in his neck and left suprascapular and trapezius region and in the left lateral arm

and reported spontaneous aching in his left fourth and fifth fingers which had begun two to three weeks earlier. According to Dr. Phillips, his examination of the claimant revealed full cervical range of motion without spasm and full shoulder range of motion. The examination of the claimant's arm was negative and he had normal strength sensation and reflexes. Dr. Phillips stated that he reviewed the results of the claimant's evoked potential tests, the findings of which he stated were not significant. Dr. Phillips testified that he had the same opinions that he had after his earlier examination; namely, that the claimant was capable of working without restrictions and that he had no residual disability.

On March 19, 1993, the claimant returned to Dr. Furry and reported that he had been in an automobile accident approximately one month earlier. The claimant complained of difficulty feeling with his left leg and little fingers and of tenderness in the thoracic spine. Dr. Furry diagnosed a thoracic strain and referred the claimant back to Dr. Schultz.

On November 4, 1993, the claimant underwent an MRI study at Dr. Phillips' request. The radiologist's report of that study states that the claimant had "degenerative disc disease [at] C5-6 with a protrusion or small herniation lateralizing to the left within the canal extending into the left C5-6 neutral foramen." Dr. Phillips reviewed the films of the test and testified that the abnormality at C5-C6 looked more like a spur than a disc. Dr. Phillips rendered an opinion, based upon his examination of the claimant and a review of the X rays, CT scan, and MRI study, that the claimant suffered from chronic cervical spondylolysis and that the condition was not caused, aggravated, or accelerated by his employment with Inter-City. He again opined that the claimant was capable of working without restrictions and that he had no residual disability related to his employment.

On December 23, 1993, at the suggestion of his attorney, the claimant saw Dr. R. Anthony Marrese, an orthopedic surgeon. Dr. Marrese testified that the claimant reported that he had experienced pain in his neck, left shoulder, and left arm after lifting heat pump coils at work. Dr. Marrese made no mention of the claimant having been in an automobile accident in February or March of 1993, and the claimant could not recall whether he told the doctor about the accident. Dr. Marrese stated that he reviewed the claimant's X rays, CT scan, and MRI study and noted spurring at C6 bilaterally, a substantial posterior osteophyte coming off the back of the body of C5 and C6, and a narrowing of the C5-C6 disc space. He admitted that the posterior osteophyte predated any work-related injury. He stated, however, that reaching, pulling, and lifting would rub the nerve root over the

roughened area and create symptomatology. After reviewing the claimant's X rays, CT scan, and MRI study, Dr. Marrese examined the claimant. According to Dr. Marrese, that examination revealed some paravertebral spasm in the trapezius, limited cervical range of motion, unequal biceps reflexes, numbness in the C6 dermatome on the left, and below normal grip strength.

Dr. Marrese saw the claimant again on February 7, 1994. He testified that his findings as of that visit were the same as those of December 23, 1993.

As of the taking of the first session of Dr. Marrese's evidence deposition on April 29, 1994, he recommended that the claimant be admitted to a hospital and undergo a myelogram and a post-myelogram CT scan to confirm or deny any additional abnormalities. As of that date, he was of the opinion that the claimant's work-related activities of lifting and moving heavy coils brought his condition into "clinical reality." He was also of the opinion that the claimant was in need of treatment, including corrective surgery to remove the obstructions of the spinal cord, and that the claimant was "most probably unemployable in any job that involves physical activity until he has proper diagnosis and treatment."

The claimant returned to see Dr. Marrese on July 11, 1994. According to Dr. Marrese, there was no change in the nature of the claimant's complaints as of that visit. On November 8, 1994, the claimant was admitted to the hospital under Dr. Marrese's care. The clinical resume of that admission prepared by Dr. Marrese states that the claimant was admitted "for myelographic evaluation, CT post myelogram, [and] probable anterior cervical discectomy at C5-C6." The claimant had a cervical myelogram and a CT scan of the cervical subarachnoid on the day he was admitted to the hospital. In his report of the cervical myelogram, Dr. J. Sherlock noted the appearance of widening of the cord on the frontal view at the C5-C6 level which he "felt" was due to a combination of degenerative spurring and "possible" superimposed disc herniation at the C5-C6 level. He also noted asymmetry of exiting nerve roots on the right of the C6-C7 level and prominent exiting nerve roots bilaterally at the C5-C6 level. Dr. Sherlock's report of the CT scan notes: a very minimal bony prominence along the anterior aspect of the spinal canal at C3-C4; a relative narrowing of the left intervertebral foramen at C5-C6 with bony prominence and superimposed disc herniation; a narrowing of the spinal canal primarily on the left along the superior aspect of the C6 vertebral body with a "quarter moon" shaped flattening of the cord; considerable bony prominence continuing along the major portion of the C6 vertebral body; a small focally herniated disc centrally at C6-C7; and a

mild bony prominence along the anterior aspect of the spinal canal at the C5 level.

Dr. Marrese operated on the claimant on November 9, 1994, performing cervical discectomies and underbody fusions at C5-C6 and C6-C7 and foramenotomies at C5-C6. Dr. Marrese testified that he removed bone spurs and multiple extruded fragments of herniated disc at the C5-C6 level. He also stated that he encountered "brisk arterial bleeding" as he was working in the C6 neuroforamen. Dr. Marrese diagnosed cervical radiculopathy secondary to spinal cord compression with early myelopathy, spinal cord compression at C5-C6, and a small herniated disc at C6-C7. When deposed, Dr. Marrese opined that the claimant's condition was causally connected to his job duties and that the claimant was unable to perform even light duty work after July 24, 1991.

The claimant continued to treat with Dr. Marrese post-operatively. When deposed on January 13, 1995, Dr. Marrese testified that the claimant was doing well and experiencing a good recovery. As of that date, Dr. Marrese was of the opinion that the claimant could return to "some sort of limited duty" which did not require him to look up or look down. Dr. Marrese also testified to the necessity for the medical care rendered to the claimant up to that time and the reasonableness of the charges for those services.

Dr. Phillips examined the claimant again on March 8, 1995. According to Dr. Phillips, the claimant was wearing a neck brace and complained of aching in his neck and left arm and of numbness in his left thumb. Dr. Phillips testified that his examination of the claimant revealed normal strength sensation and normal deep tendon reflexes. Dr. Phillips stated that he reviewed the myelogram and CT scan performed on November 8, 1994, and found chronic degenerative disc disease at C5-C6 with sclerotic borders and mild decreasing disc height and a spur which did not compress the cord. Because spinal fluid was visible anterior to the cord, Dr. Phillips explained that there was no herniated disc at that level. He testified that the claimant's doctors had misinterpreted an artifact as a herniation and attributed the artifact to the small format imaging machine in use at the hospital where the test was performed. According to Dr. Phillips, there was evidence of spondylolysis at C6-C7 but no evidence of a herniated disc. He also found no evidence of herniation at C5-C6. Dr. Phillips repeated his earlier opinion that the spur seen in the studies predated any work-related injury. He further opined that the claimant's job duties did not necessitate surgery.

On May 30, 1995, the claimant saw Dr. Marrese, whose notes reflect that the claimant had full normal abduction and internal rota-

tion and reported feeling good except for stiffness in his neck. Dr. Marrese released the claimant to return to light duty work with restrictions against lifting, bending, and stooping.

The claimant testified that he neither worked nor sought employment from July 21, 1991, until he was released to work by Dr. Marrese, at which time he began working for his father.

Following the arbitration hearing, the arbitrator issued a decision finding that the claimant had sustained an accidental injury which arose out of and in the course of his employment with Inter-City. The arbitrator further found, however, that the claimant's condition had stabilized by September 24, 1991, and that his condition of ill-being at the time of the arbitration hearing was not causally related to his work activities. Accordingly, the arbitrator awarded the claimant TTD benefits for a period of $8^2/_7$ weeks ending on September 24, 1991, and PPD benefits for 5% loss of a man as a whole. The arbitrator also ordered Inter-City to pay $260 in medical expenses incurred prior to September 24, 1991. In his decision, the arbitrator made specific note of the fact that the claimant elected not to undergo the tests recommended by Dr. Schultz, missed eight physical therapy sessions prescribed by Dr. Furry in August and September of 1991, failed to attend a medical examination scheduled by Inter-City in September 1991, and received no medical treatment from September 1991 until August 1992, when he returned to Dr. Furry at the suggestion of his attorney shortly after he signed an application for adjustment of claim. The arbitrator noted in his decision that he accepted the testimony and opinions of Dr. Phillips and found the testimony of Dr. Marrese to be not credible. The arbitrator concluded that the objective medical evidence failed to rebut Dr. Phillips' opinion that the claimant had a preexisting degenerative spur which could have been aggravated by his work activities in 1991, but that the effects of that aggravation resolved without affecting the claimant's ability to work and did not necessitate further treatment.

The claimant sought a review of the arbitrator's decision before the Commission. On July 18, 1997, the Commission issued a unanimous decision affirming and adopting the arbitrator's decision. Thereafter, the claimant sought a judicial review of the Commission's decision in the circuit court of Randolph County (docket number 97 MR 67).

On October 27, 1998, Judge Patrick M. Young entered an order, finding *inter alia* that: the claimant's condition of ill-being after September 24, 1991, was causally related to his work injury; the medical treatment which the claimant received after that date was both reasonable and necessary; and the Commission's decision of July 18,

1997, is against the manifest weight of the evidence. Judge Young remanded the matter to the Commission.

Inter-City filed a notice of appeal from the circuit court's October 27, 1998, order. On July 18, 1999, this court dismissed that appeal, docketed as number 5—98—0712WC, for lack of jurisdiction. See *Inter-City v. Industrial Comm'n*, No. 5—98—0712WC (1999) (unpublished order under Supreme Court Rule 23).

On May 31, 2000, the Commission, without taking any additional evidence, issued its decision on remand, one commissioner dissenting. The Commission awarded the claimant TTD benefits for a period of 200⁶/₇ weeks, PPD benefits for 25% loss of a man as a whole, and $33,425.70 in medical expenses. Contrary to the finding in its original decision, the majority determined that Dr. Marrese was a credible witness. Also, in the second paragraph of its decision, the Commission stated that it was ordered by the circuit court to recalculate the claimant's TTD benefits from July 25, 1991, through May 30, 1995, and to recalculate his PPD benefits. The dissenting commissioner asserted that the claimant did not establish his entitlement to TTD benefits for the period from September 25, 1991, through December 27, 1993.

Inter-City sought a judicial review of the Commission's May 31, 2000, decision in the circuit court of Randolph County (docket number 00 MR 60). On December 11, 2000, Judge William A. Schuwerk, Jr., entered an order confirming the Commission's decision, and Inter-City filed a timely notice of appeal.

On appeal, Inter-City first asks us to review the circuit court's October 27, 1998, order setting aside the Commission's initial decision in this case. Inter-City argues that the Commission's July 18, 1997, decision was not against the manifest weight of the evidence, as Judge Young found, and that, accordingly, we must reverse the October 27, 1998, circuit court order and reinstate the Commission's original decision.

■ In *Stockton v. Industrial Comm'n*, 69 Ill. 2d 120, 126, 370 N.E.2d 548 (1977), the Illinois Supreme Court held that, in an appeal from a decision entered by the Commission upon remand from the circuit court, the reviewing court is "authorized to review the entire record and determine the propriety of the circuit court's original order, which reversed and remanded the matter to the Industrial Commission ***. [Citations.]" Our analysis begins, therefore, with an examination of the October 27, 1998, order, in which the circuit court found the Commission's decision of July 18, 1997, to be against the manifest weight of the evidence.

■ It is the function of the Commission to decide questions of fact,

judge the credibility of witnesses, and resolve conflicting evidence, including conflicting medical evidence. *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253, 403 N.E.2d 221 (1980). The Commission's determination on a question of fact will not be disturbed on review unless it is against the manifest weight of the evidence. *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 44, 509 N.E.2d 1005 (1987).

For a finding of fact to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *Caterpillar, Inc. v. Industrial Comm'n*, 228 Ill. App. 3d 288, 291, 591 N.E.2d 894 (1992). Whether a reviewing court might reach the same conclusion is not the test of whether the Commission's determination of a question of fact is supported by the manifest weight of the evidence. Rather, the appropriate test is whether there is sufficient evidence in the record to support the Commission's determination. *Benson v. Industrial Comm'n*, 91 Ill. 2d 445, 450, 440 N.E.2d 90 (1982).

The disposition of this case before the Commission rested almost entirely upon a resolution of the conflicting medical evidence offered by Dr. Phillips and Dr. Marrese.

After reviewing the claimant's X rays, CT scans, MRI study, and myelogram, Dr. Phillips detected spurring at C5-C6 but no evidence of any herniated disc. He diagnosed the claimant as suffering from chronic cervical spondylolysis which was not caused, aggravated, or accelerated by his employment. Dr. Phillips testified that, when he examined the claimant on January 9, 1992, and March 16, 1993, he found the claimant to have full range of motion, normal strength, and normal reflexes. As early as January 9, 1992, Dr. Phillips was of the opinion that the claimant was capable of working without restrictions and had no residual disability. He was also of the opinion that the surgery performed by Dr. Marrese was not necessitated by the claimant's work activities.

According to Dr. Marrese, his examination of the claimant on December 23, 1993, revealed a limited range of motion, unequal reflexes, and below normal strength. He testified that, when he operated upon the claimant on November 9, 1994, he removed bone spurs and multiple extruded fragments of herniated disc at C5-C6. Dr. Marrese diagnosed the claimant as suffering from cervical radiculopathy, spinal cord compression, and disc herniation, which he opined was causally related to the claimant's job duties. Dr. Marrese also testified that the claimant was unable to perform even light duty work after July 24, 1991.

In its original decision, the Commission unanimously adopted the decision of the arbitrator, which accepted the opinions and testimony of Dr. Phillips and found Dr. Marrese to be not credible. The circuit

court's October 27, 1998, order finding the Commission's original decision to be against the manifest weight of the evidence states that Dr. Phillips' opinions concerning the nature of the claimant's condition are contrary to Dr. Marrese's observations when he operated upon the claimant and are also contrary to the radiology reports issued over a four-year period from shortly after the claimant began experiencing pain, up until his operation. However, the circuit court's findings as to the radiology reports are a bit overstated.

The X rays of the claimant taken on August 10, 1991, revealed a minimal narrowing at C5-C6 and localized cervical osteoarthritis but no other significant degenerative changes. The report of the CT scan performed on August 19, 1991, noted degenerative spurring at C5-C6 but stated that the *"possibility"* of a protruding disc at that location could not be ruled out. The report of the MRI study conducted on November 4, 1993, states that the claimant has degenerative disc disease at C5-C6 with a protrusion *"or"* a small herniation at that level. Dr. Sherlock's report of the myelogram performed on November 8, 1994, notes degenerative spurring and a *"possible"* superimposed disc herniation at C5-C6. The post-myelogram CT scan done on November 8, 1994, revealed a bony prominence at C5-C6 with a superimposed disc herniation. It is only Dr. Sherlock's report of this post-myelogram CT scan which is unequivocal on the presence of a disc herniation. However, Dr. Phillips opined that Dr. Sherlock misinterpreted an artifact as a herniation and attributed the error to the small equipment in use at the hospital where the test was performed. He also testified that the presence of visible spinal fluid eliminated the possibility of a disc herniation.

Clearly, Dr. Phillips' testimony, if believed, is more than sufficient to support the Commission's original decision and in particular its finding that the claimant's condition of ill-being subsequent to September 24, 1991, is not causally related to his employment with Inter-City or its predecessor, Snyder. It appears that the circuit court, in its order of October 27, 1998, substituted its judgment for that of the Commission on a credibility issue rather than according the Commission's decision the required deference. The claimant, however, notes that, in its May 31, 2000, decision, the Commission found Dr. Marrese to be a credible witness and found that the claimant's condition of ill-being after September 24, 1991, was causally related to his employment. Citing the Illinois Supreme Court's holding in *Freeman United Coal Mining Co. v. Industrial Comm'n*, 188 Ill. 2d 243, 720 N.E.2d 1063 (1999), the claimant argues that it is the Commission's May 31, 2000, decision, not its July 18, 1997, decision, which must be accorded deference. We believe, however, that the claimant has interpreted *Freeman United* far too broadly.

■ In *Freeman United*, the circuit court set aside the Commission's initial decision denying the claimant benefits, finding it to be against the manifest weight of the evidence. On remand, the Commission awarded the claimant benefits, and the circuit court subsequently confirmed that decision. *Freeman United*, 188 Ill. 2d at 244-45. It is true that our supreme court held that the factual determinations set forth in the Commission's second decision must be accorded deference. *Freeman United*, 188 Ill. 2d at 248. Significantly, however, the supreme court had already determined that the Commission's original decision was incorrect as a matter of law and that the circuit court properly reversed that decision and remanded the matter back to the Commission for further consideration. *Freeman United*, 188 Ill. 2d at 246, 249. The supreme court did not rely upon any factual finding in the Commission's second decision to support its conclusion that the Commission's initial decision was properly reversed. To do so would, for all practical purposes, render a circuit court's order setting aside a decision of the Commission unreviewable. We believe that the holding in *Freeman United* is properly interpreted as requiring a court reviewing a Commission decision entered upon remand from the circuit court to first resolve the question of whether the circuit court properly reversed the Commission's initial decision and, if it did, then to accord deference to the Commission's factual determinations on remand. If, on the other hand, the trial court erred in reversing the Commission's initial decision, its order should be reversed, the Commission's subsequent decision after remand vacated, and its original decision reinstated. See *F&B Manufacturing Co. v. Industrial Comm'n*, 325 Ill. App. 3d 527 (2001).

Our review of the record in this case leads us to conclude that the Commission's original decision in this matter was not against the manifest weight of the evidence. As a consequence, we find that the circuit court erred when it set aside the Commission's decision and remanded the matter for further consideration.

For the foregoing reasons, we reverse the circuit court's order of October 27, 1998, vacate the circuit court's order of December 11, 2000, vacate the Commission's decision of May 31, 2000, and reinstate the Commission's decision of July 18, 1997.

Reversed in part and vacated in part; original Commission decision reinstated.

McCULLOUGH, P.J., and O'MALLEY, HOLDRIDGE, and RARICK, JJ., concur.