2019 IL App (1st) 190373WC-U

Workers' Compensation
Commission Division
Order Filed: December 27, 2019

No. 1-19-0373WC

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| BRIAN ISENHART, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 18 L 50290 |
| | ) | |
| THE ILLINOIS WORKERS' COMPENSATION | ) | |
| COMMISSION *et al.*, | ) | Honorable |
| | ) | Michael F. Otto, |
| (Village of Matteson, Appellee). | ) | Judge, Presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hudson, Cavanagh, and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held:*   We affirmed the circuit court's judgment confirming the Workers' Compensation Commission's (Commission) decision denying the claimant benefits under the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2014)). We found that the Commission's determinations that the claimant failed to prove that he suffered an accidental injury arising out of and in the course of his employment, or that there is a causal connection between his accident and his current condition of ill-being, are not against the manifest weight of the evidence.

¶ 2    The claimant, Brian Isenhart, appeals from an order of the circuit court of Cook County that confirmed a decision of the Workers' Compensation Commission (Commission), denying him benefits under the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2014)) for injuries he is alleged to have sustained on November 8, 2014, while in the employ of the Village of Matteson (the Village). For the reasons that follow, we affirm the judgment of the circuit court.

¶ 3    The following factual recitation is taken from the evidence adduced at the arbitration hearings held on January 27, 2016, February 25, 2016, and March 21, 2016.

¶ 4    The claimant has a medical history that is relevant to this appeal. On September 6, 2013, while stepping off of a fire truck, the claimant injured his right foot. Specifically, the injury was to his right first metatarsophalangeal joint of his big toe. After receiving treatment for this injury, the claimant returned to full duty work on December 17, 2013. Between December 17, 2013, and November 8, 2014, the claimant had no problems with his right foot, toe, or ankle and had no difficulty performing his work duties.

¶ 5    The claimant testified that, beginning in September 26, 2004, he was employed as a full-time Village firefighter paramedic. The claimant's employment contract requires that he engage in regular "workouts." On November 8, 2014, he was lifting weights alone, during regular work hours, in an on-site gym at the fire station. While performing a "military push press" (a maneuver in which he lifted a bar loaded with weight into a neutral position, bent at the knee into a squat, and then pushed the bar upwards above his shoulders into a standing position) he felt a sharp pain in his right ankle and foot. According to the claimant, he loaded the bar with 70 to 80 pounds of weight and, when he pushed it above his shoulders from the squat, his foot "gave out," and he

dropped the weight. The claimant stated that he experienced pain and swelling in his right ankle and foot and was unable to put any weight on his foot.

¶ 6    The claimant immediately reported the accident to his supervisor, and they both prepared accident reports. The claimant's supervisor then directed him to an urgent care facility, Ingalls Family Care Center, where he was examined, x-rays were taken, and he was given pain medication and crutches.

¶ 7    The claimant testified that he continued to experience pain in his right ankle and foot, and on November 10, 2014, he sought treatment at Ingalls Occupational Health. The claimant informed the treating physician that his right foot "gave out" while "working out." He was advised to take his medication, elevate and ice his ankle and foot, and continue to use crutches. The claimant stated that he was also released for light duty work; however, the Village did not have light duty work available at that time.

¶ 8    On November 12, 2014, the claimant sought treatment with Dr. Nick Mallios, a chiropractor. According to Dr. Mallios, the claimant maintained that on November 8, 2014, he "felt a severe pain in [his right] foot" while performing a military push press at work and that he had been "hurt in the same area before." Under Dr. Mallios' care, the claimant received right ankle and foot manipulations, acupuncture, and trigger point therapy to "relax his musculature and decrease his discomfort." After six weeks of treating with Dr. Mallios, the claimant's condition improved, and he no longer needed crutches. However, the claimant's improvement also plateaued, and at the end of the treatment, Dr. Mallios recommended that he see a specialist.

¶ 9    On January 20, 2015, the claimant sought treatment with Dr. Brian Burgess, a podiatrist at Hinsdale Orthopaedics. According to Dr. Burgess's medical records, the claimant informed him

that on November 8, 2014, he "stepped down wrong" on his right foot and consequently, experiences sharp and stabbing pain, especially with "movement, walking[,] and standing." Dr. Burgess noted that the claimant sustained an injury at work (the prior September 2013 injury) on the "right medial side" of his foot and that he complained of experiencing the "same symptoms in November 2014" as the September 2013 injury, except that the pain was to the lateral side of his foot, not the medial. During this same visit, Dr. Burgess ordered two MRIs, one of the claimant's right ankle and one of his right foot. The MRIs were taken on January 27, 2015, and revealed evidence of the following: (1) contusion or occult fracture and a small tibiotalar joint effusion in the right ankle; and (2) mild chondral thinning at the first metatarsophalangeal joint involving the distal metatarsal head and proximal phalanx and a small joint effusion in the right foot.

¶ 10    On February 12, 2015, the claimant again visited Dr. Burgess, who recommended a course of physical therapy, which the claimant received from February 13, 2015, through March 11, 2015. After the initial course of physical therapy, the claimant returned to Dr. Burgess on March 12, 2015, and he recommended two additional weeks of physical therapy from March 16, 2015, to March 27, 2015, followed by two weeks of work conditioning from March 30, 2015, to April 15, 2015.

¶ 11    The physical therapy included, *inter alia*, a variety of stretching and strengthening exercises to simulate the kinds of activities a firefighter paramedic would complete. The work conditioning took place five days a week for five hours a day and, as it continued, the claimant experienced increasing physical pain in his right ankle and foot. The physical therapist determined that work conditioning was limited because of the claimant's complaints of pain and that it should be discontinued until his "inflammation is addressed."

¶ 12    On April 16, 2015, the claimant returned to Dr. Burgess, who ordered an ultrasound of his right ankle. The ultrasound was performed on April 30, 2015, and revealed a "thickened right anterior talofibular ligament consistent with previous partial tear," possibility of "mild impingement," and a "[p]rominent osteophyte at the right distal tibia within the anterior compartment of the ankle joint."

¶ 13    On May 7, 2015, the claimant again visited Dr. Burgess, complaining of "sharp and stabbing" pain in his right ankle. Dr. Burgess noted that the claimant had failed "extensive, conservative treatment since November" and consequently, recommended right ankle arthroscopy and resection of the osteophytes. There is no evidence in the record that Dr. Burgess gave a causation opinion.

¶ 14    On February 9, 2015, and June 8, 2015, at the Village's request, the claimant underwent independent medical examinations (IMEs) with Dr. Armen Kelikian, an orthopedic surgeon who specializes in foot and ankle orthopedic surgery. Dr. Kelikian initially misunderstood the events leading up to the claimant's injury, conflating the November 8, 2014 accident with the claimant's previous and unrelated September 2013 accident where he injured his big toe while stepping off a truck. However, Dr. Kelikian's medical opinions were related to the November 8, 2014 incident.

¶ 15    In his February 9, 2015 report, Dr. Kelikian diagnosed the claimant with "equinus and Achilles tendonitis," noted that this tendonitis could have been an "aggravated preexisting problem," and determined that there was "no known accident." He recommended a functional capacity evaluation (FCE) to determine the claimant's capabilities and an MRI or ultrasound if the claimant's ankle still "bothers him." In his addendum to the February 9, 2015 report, Dr. Kelikian noted that he reviewed the medical records that were sent from Drs. Mallios and Burgess, including

the claimant's January 27, 2015 MRI. Dr. Kelikian's medical diagnosis remained the same, "equinus and Achilles tendinosis and a past history of turf toe." He also maintained that there was "no known accident just [the claimant's] foot giving way" after the original toe injury occurred in September. He once again recommended a FCE.

¶ 16    In his June 8, 2015 report, Dr. Kelikian noted that he received additional medical records, including the April 30, 2015 ultrasound and that he performed his own fluoroscopic examination, revealing no impingement. Dr. Kelikian opined that he was "not impressed" with the April 30, 2015 ultrasound "impingement diagnosis for the osteophytes" and determined that the findings of the tenderness in the claimant's anterior ankle were subjective. He also opined that any further medical treatment was unnecessary and did not recommend right ankle arthroscopic surgery.

¶ 17    Dr. Kelikian testified in his evidence deposition that, based on his review of the claimant's medical records and patient history, he does not believe there was an injury as there was no indication of major or minor trauma, just subjective complaints of symptoms. According to Dr. Kelikian, there is nothing that he observed in the medical records of any physical examination documenting a concrete description of injury at the time surrounding the November 8, 2014 accident. He maintained that there is only a report of an accident, not a physical examination. According to Dr. Kelikian, no patient he has treated has ever complained of a foot injury from weight-lifting. He stated that, although a foot injury from lifting a heavy barbell could be possible, it is scientifically improbable.

¶ 18    Dr. Kelikian found both the November 8, 2014 emergency room reports from the urgent care facility and Dr. Mallios's November 12, 2014 report unreliable. Based on the unreliability of

the medical records, he based his medical opinion on his own February 9, 2015 and June 8, 2015 IMEs of the claimant.

¶ 19    With respect to the April 30, 2015 ultrasound results, Dr. Kelikian conceded that it was possible for an anterior talofibular ligament tear to result from a foot "giving out" while lifting a barbell; however, he testified that the claimant's pain could have also developed without any trauma or injury. Dr. Kelikian maintained that there was no injury and that the claimant developed a sharp pain when he lifted the barbell. Further, Dr. Kelikian testified that it would have been impossible for the claimant to develop osteophytes in the several months between the alleged injury and the time of Dr. Kelikian's examinations. He opined that: the claimant did not experience an ankle or foot injury, but rather subjective complaints of ankle pain; no surgery was needed; and the claimant's next step should have been an FCE to determine his ability to return to work.

¶ 20    The Village also presented the testimony of two witnesses who personally observed the claimant after the November 8, 2014 accident. The first witness was Eileen Majda, the Village's benefits administrator. Majda testified that, on three separate occasions between November 2014, and December 2015, she observed the claimant walking without crutches and with a normal, unimpeded gait.

¶ 21    The Village also called Erik Ekstrom, a private investigator hired to investigate the claimant. Ekstrom testified that, during his surveillance on January 13, 2015, he observed the claimant walking with a normal gait, taking out the trash, and performing chest exercises at the gym. According to Ekstrom, on January 15, 2015, he observed the claimant walking with a usual gait without the assistance of crutches on his entrance and exit from the gym. He also observed the claimant on the treadmill, lifting 50 to 70 pound weights above his head, while simultaneously

flexing both ankles and standing on his "tippy toes," without appearing to be in pain. Ekstrom recorded video during his surveillance, and a DVD of that video was admitted into evidence. However, a copy of the DVD is not a part of the record on appeal.

¶ 22    On July 13, 2015, Dr. Burgess released the claimant for light duty work with the following restrictions: lifting no greater than 15 pounds, no running, jumping, squatting, kneeling, or ladder climbing.

¶ 23    On July 20, 2015, the Village made light duty work available to the claimant for the first time. The claimant testified that he worked 40 hours a week for two weeks, performing office work. This assignment required a significant amount of walking, causing pain in his right ankle and foot, requiring him to use crutches again. In response to the claimant's complaints, Dr. Burgess modified his work restrictions to 15 hours of light duty work per week, which he began on August 7, 2015.

¶ 24    On August 18, 2015, the claimant treated with Dr. Ari Kaz, an orthopedic surgeon who specializes in foot and ankle orthopedic surgery. Dr. Kaz recommended a cortisone shot for the claimant's ankle pain, which was administered on August 31, 2015. Dr. Kaz testified via evidence deposition that he observed swelling of the claimant's right ankle and foot, diminished range of motion in the ankle, instability of the ankle, and tenderness over the anterior talofibular ligament and the anterior-inferior tibiofibular ligament. According to Dr. Kaz, he diagnosed the claimant with persistent right ankle pain with impingement syndrome, anterior talofibular ligament tear and distal tibia anterior osteophyte. On September 21, 2015, Dr. Kaz recommended "right ankle arthroscopy with debridement with manipulation of the ankle joint under anesthesia *** as well as

removal of the distal tibia osteophyte and lateral ankle ligament reconstruction to address the tear of the anterior talofibular ligament."

¶ 25    Dr. Kaz testified that "[i]t seems like [the claimant] was lifting the barbell, dorsiflexed his ankle which caused pain, and then his ankle twisted." According to Dr. Kaz, the anterior talofibular ligament tear and the need for surgery were all causally related to the claimant's November 8, 2014 work accident.

¶ 26    Following hearings on January 27, 2016, February 25, 2016, and March 21, 2016, the arbitrator found that the claimant sustained an accidental injury arising out of and in the course of his employment with the Village, and that his current condition of ill-being, requiring arthroscopic right ankle surgery, is causally related to his work accident. The arbitrator determined that the claimant's medical services were reasonable and necessary and ordered the Village to authorize in writing, and pay for, both his arthroscopic right ankle surgery and "all reasonable pre and post surgical testing and care." The arbitrator awarded the claimant: 36 1/7 weeks of temporary total disability (TTD) benefits, under section 8(b) of the Act (820 ILCS 305/8(b) (West 2012)), for the period from November 8, 2014, through July 19, 2015; 32 4/7 weeks of temporary partial disability (TPD) benefits, under section 8(a) of the Act (820 ILCS 305/8(a) (West 2012)), for the period from August 7, 2015, through March 21, 2016; and $15,153.87 for reasonable and necessary medical services under section 8(a) of the Act (820 ILCS 305/8(a) (West 2012)). Additionally, the arbitrator awarded the Village a credit against the TTD benefits award, in the amount of $24,240.52, under section 8(j)(2) of the Act (820 ILCS 305/8(j)(2) (West 2012)). The arbitrator awarded the Village a credit of $3000 for the advance it gave to the claimant. Lastly, the arbitrator

denied the claimant's petition for attorney fees and penalties under sections 16, 19(k), and 19(*l*) of the Act (820 ILCS 305/16, 19(k), 19(*l*) (West 2012)).

¶ 27    The Village and the claimant sought review of the arbitrator's decision before the Commission. The Commission, with one commissioner partially concurring and partially dissenting, reversed the decision of the arbitrator, finding that: the claimant failed to prove that his accident arose out of his employment with the Village; the claimant failed to prove a causal connection between the accident and his current condition of ill-being; and the treatment the claimant received from Dr. Ari Kaz exceeded the number of permissible providers/referrals under the Act. The Commission vacated the decision of the arbitrator; denied benefits to the claimant; and granted the Village a credit for "all amounts paid, if any, to or on behalf of [the claimant] on account of said accidental injury." Lastly, the Commission affirmed the arbitrator's denial of penalties and fees.

¶ 28    The partially dissenting commissioner agreed with the majority opinion that the treatment the claimant received from Dr. Kaz exceeded the number of referrals under the Act and agreed with the denial of penalties and fees. However, the commissioner also disagreed with the majority opinion, finding that the claimant: proved that he sustained "a compensable accident that arose out of and in the course of his employment;" is entitled to medical expenses in the amount of $18,894.87; and is entitled to TTD benefits from November 9, 2014, through July 19, 2015. The commissioner also found that the cause should be remanded back to the arbitrator, pursuant to *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327 (1980), for further proceedings to determine additional TTD benefits or compensation for permanent disability, if any.

¶ 29    The claimant sought judicial review of the Commission's decision in the circuit court of Cook County. The circuit court confirmed the Commission's decision, and this appeal followed.

¶ 30    For his first assignment of error, the claimant argues that the Commission's finding that he failed to prove that his accident arose out of his employment with the Village and that his current condition of ill-being is not causally related to his work accident of November 8, 2014, is against the manifest weight of the evidence. Although the claimant sets forth both issues, his argument focused on the causation issue. We agree that this case presents a question of causation.

¶ 31    The claimant has the burden of establishing by a preponderance of the evidence the elements of his claim, including "some causal relation between the employment and the injury." *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 63 (1989). Whether a causal relationship exists between a claimant's employment and his condition of ill-being is a question of fact to be resolved by the Commission, and its resolution of the issue will not be disturbed on review unless it is against the manifest weight of the evidence. *Certi-Serve, Inc. v. Industrial Comm'n*, 101 Ill. 2d 236, 244 (1984). In resolving such issues, it is the function of the Commission to decide questions of fact, judge the credibility of witnesses, and resolve conflicting medical evidence. *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253 (1980). Whether a reviewing court might reach the same conclusion is not the test of whether the Commission's determination of a question of fact is supported by the manifest weight of the evidence; rather, the appropriate test is "whether there was sufficient factual evidence in the record to support the Commission's decision." *Benson v. Industrial Comm'n*, 91 Ill. 2d 445, 450 (1982). We will affirm a decision of the Commission if there is any basis in the record to do so, regardless of whether the Commission's

reasoning is correct or sound. *Freeman United Coal Mining Co. v. Industrial Comm'n*, 283 Ill. App. 3d. 785, 793 (1996).

¶ 32    Applying these standards, we cannot conclude that the Commission's finding, that the claimant's current condition of ill-being is not causally related to his alleged work accident of November 8, 2014, is against the manifest weight of the evidence.

¶ 33    The claimant testified that, on November 8, 2014, while performing a "military push press" in the Village's gym facility, his right ankle and foot "gave out." The claimant denied stating that his ankle rolled over, twisted, or inverted, but instead maintained that his foot simply "gave out" while lifting a barbell over his shoulders and that he experienced severe pain.

¶ 34    Dr. Kelikian and Dr. Kaz offered completely different medical opinions. Dr. Kelikian opined that it is scientifically improbable for an ankle injury to result from lifting a heavy barbell; that the medical records present no evidence of an injury or a physical examination documenting a concrete description of injury at the time surrounding the November 8, 2014 accident; that the claimant did not incur an injury on November 8, 2014, but rather experienced subjective symptoms of pain; and that right ankle arthroscopic surgery is unnecessary. Dr. Kaz opined that, while the claimant was lifting the barbell, he "dorsiflexed his ankle which caused pain, and then his ankle twisted." Dr. Kaz also determined that the claimant incurred an injury and that his need for right ankle arthroscopic surgery was causally related to the claimant's November 8, 2014 work accident.

¶ 35    The Commission found the claimant's testimony not credible and found his "subjective complaints" of pain "questionable" based on his ankle and foot MRIs, which did not reveal any acute pathology, as well as the testimonies of both Majda and Eriksom, who observed the claimant,

subsequent to November 8, 2014, weightlifting and walking normally without assistance or apparent pain.

¶ 36    Further, the Commission afforded greater weight to the medical opinions of Dr. Kelikian over those of Dr. Kaz, finding that Dr. Kelikian's opinions—that the claimant did not need right ankle arthroscopic surgery and did not incur an injury—were supported by facts in the record whereas Dr. Kaz's opinions—that the claimant's injury and his need for surgery were causally connected to the work accident—were based on a mechanism of injury not supported by the record, that the claimant twisted his ankle.

¶ 37    It was the function of the Commission to resolve the conflict in medical testimony, and we will not substitute our judgment or reweigh the evidence because a different inference could be drawn from the evidence. *O'Dette,* 79 Ill. 2d at 253. Dr. Kelikian's causation opinions as well as the medical records are more than sufficient to support the conclusions reached by the Commission in making its causation determination. Accordingly, the Commission's decision denying the claimant benefits and prospective medical treatment under the Act based on his condition of ill-being not being causally related to a work-related accident is not against the manifest weight of the evidence.

¶ 38    Having reached this conclusion, we need not address the claimant's remaining arguments on appeal as "[a] prerequisite to the right to compensation is that the accidental injury must arise out of, as well as occur, in the course of the employment *** sufficient to give rise to the right to compensation. There must be some causal relation between the employment and the injury." *Schwartz v. Industrial Comm'n*, 379 Ill. 139, 144-45 (1942).

¶ 39    For the reasons stated, we affirm the judgment of the circuit court of Cook County, which confirmed the decision of the Commission.

¶ 40    Affirmed.