R&D THIEL, a Division of Carpenter Contractors of America, Appellant, v. ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Manuel Robledo, Appellee).

First District (Illinois Workers' Compensation Commission Division)

No. 1—08—3666WC

Opinion filed February 9, 2010.

Maciorowski, Sackmann & Ulrich, of Chicago (J. Sackmann and J. Garrison, of counsel), for appellant.

Goldstein, Bender & Romanoff, of Chicago (Richard H. Victor, of counsel), for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:

R&D Thiel, a division of Carpenter Contractors of America, (R&D), appeals from an order of the circuit court of Cook County that confirmed a decision of the Illinois Workers' Compensation Commission (Commission) awarding the claimant, Manuel Robledo, benefits under the Workers' Compensation Act (Act) (820 ILCS 305/1 et seq. (West 2004)). For the reasons that follow, we affirm the judgment of the circuit court and remand the matter to the Commission for further proceedings.

The following factual recitation is taken from the evidence presented at the arbitration hearing.

The claimant was employed by R&D as a laborer. The claimant testified that, on January 5, 2004, he fell from a ladder while he was working for R&D. According to the claimant, he fell 12 feet and landed on his right side. He stated that he felt pain in his back immediately.

On January 6, 2004, the claimant sought treatment from Dr. Cavazos, a chiropractor. Dr. Cavazos' records reflect that the claimant complained of low-back pain and contain a history of the claimant having fallen nine feet while working on the day before. X-rays of the claimant's lumbar spine and right hip taken January 7, 2004, on orders of Dr. Cavazos were negative. In a letter dated January 7, 2004, Dr. Cavazos wrote that, when seen, the claimant complained of severe to moderate low-back pain and some sciatica as a result of an eight-foot fall onto a basement floor which occurred on January 5, 2004. Dr. Cavazos estimated that the claimant would be unable to work for a period from two to four weeks and would require therapy.

The claimant returned to see Dr. Cavazos on January 9, 2004. The doctor's notes of that visit state that the claimant had improved 20%. Dr. Cavazos recommended that the claimant have an MRI of his lumbar spine, which the claimant had that same day. Dr. John Aikenhead, also a chiropractor, interpreted the scan. According to Dr. Aikenhead, the MRI of the claimant's lumbar spine revealed a central

protrusion at L4-L5, effacing the thecal sac with a small annular tear within the disk. In a letter dated January 17, 2004, Dr. Cavazos noted that the claimant was still complaining of low-back pain with right radiculopathy. He described the claimant's L4-L5 disk protrusion as "recent in nature and not pre-existing." The doctor continued the claimant's off-work status and estimated that he would be totally disabled for another four to six weeks.

The claimant next saw Dr. Cavazos on January 20, 2004. In his notes of that visit, Dr. Cavazos wrote that the claimant had a potential right knee problem from a fall at work which had been masked by severe low-back pain and right sciatica.

On January 27, 2004, the claimant was examined by Dr. Charles Mercier, an orthopaedic surgeon, at the request of R&D. Dr. Mercier testified that, when he examined the claimant on that date, his complaints were limited to low- and mid-back pain. The claimant made no mention of any right knee problems. Nevertheless, Dr. Mercier examined the claimant's right knee and found nothing abnormal. Dr. Mercier diagnosed an acute lumbosacral strain and found that the claimant was capable of light-duty work with lifting and bending restrictions. He reviewed the MRI of the claimant's lumbar spine and found no evidence of nerve root impingement. According to Dr. Mercier, the small lumbar disk protrusion at L4-L5 and the annular tear were incidental to degenerative findings, and he did not believe that the claimant's fall at work aggravated the condition. He opined that 12 chiropractic treatments or physical therapy sessions would be sufficient and that the claimant should be able to return to his regular work duties within six weeks following his injury.

When Dr. Cavazos examined the claimant on January 28, 2004, he noted that the claimant had an internal derangement of the right knee and recommended that he undergo an MRI of the knee. The claimant had the recommended MRI the following day, January 29, 2004. Dr. Aikenhead interpreted that MRI as showing mild bone edema of the medial facet of the patella, suggesting a "questionable" contusion or transchondral fracture of the medial facet of the patella and minimal edema near the femoral attachment, which "suggested" a slight strain of the anterior cruciate ligament. Dr. Aikenhead described the medial and lateral menisci and the medial and lateral collateral ligament complexes as normal. Dr. Cavazos testified that the claimant's back and knee conditions were both causally connected to his fall at work on January 5, 2004.

The claimant continued to receive chiropractic care from Dr. Cavazos. Dr. Cavazos referred the claimant to Dr. Howard Freedberg, an orthopaedic surgeon, whom the claimant saw for the first time on

February 5, 2004. In a letter dated that same day, Dr. Freedberg wrote that the claimant complained of pain in his right lower back, radiating to his hamstrings, thigh, and knee. X-rays of the claimant's knee revealed a "questionable" defect of the central area on the lateral projection. Dr. Freedberg also reviewed the MRI of the claimant's lumbar spine. He diagnosed a herniated L4-L5 disk with radiculopathy, right traumatic retropatellar pain syndrome, and an osteochondral fracture. Dr. Freedberg prescribed a Shield's brace and Celebrex, authorized the claimant to remain off work, and referred him back to Dr. Cavazos for additional treatment.

The claimant was again seen by Dr. Freedberg on February 19, 2004. At that time, Dr. Freedberg diagnosed low-back pain and right knee traumatic retropatellar syndrome. He injected the claimant's right knee and sent him back to Dr. Cavazos for an aggressive strengthening program.

The claimant saw Dr. Cavazos on February 25, 2004. The doctor's records of that visit reflect that the claimant had full range of motion in his back and only minimal complaints.

The claimant next saw Dr. Freedberg on March 15, 2004. The claimant reported that his right knee was bothering him significantly. The doctor noted that the injection which he administered at the claimant's last visit had only relieved his knee pain for two days. On examination of the claimant's right knee, Dr. Freedberg found negative apprehension, very little joint line tenderness, stable ligaments, and good tracking. He also found extensor mechanism problems and felt that there was an obvious osteochondral fracture of the medial facet and recommended arthroscopic surgery with debridement of the osteochondral-fracture fragment.

When Dr. Freedberg last saw the claimant on April 15, 2004, he noted that the claimant's MRI shows an osteochondral fracture of the patella, and he again recommended surgery.

In a letter to R&D's insurance carrier dated April 21, 2004, Dr. Cavazos wrote that the claimant was still off work and awaiting knee surgery. He reported that the claimant's sciatica was improving.

On May 18, 2004, the claimant was again examined by Dr. Mercier at the request of R&D. Dr. Mercier testified that it was at this second examination that the claimant first mentioned any knee problems. On examination of the claimant's right knee, Dr. Mercier found no swelling, no pain over the posterior medial joint line, pain with crepitation with patellar compression, full range of motion with subpatellar crepitation, and media instability. Based upon the lack of any positive knee findings at the time of his initial examination, the claimant's failure to report any knee complaints when he first saw him on Janu-

ary 27, 2004, and the 15-day interval between the claimant's work injury and the first notation in any medical record of knee pain, Dr. Mercier opined that the claimant's knee complaints are not related to his work injury on January 5, 2004. According to Dr. Mercier, if the claimant had sustained a fracture or other osteochondral injury to his right knee when he fell at work, he would have been aware of it immediately. He also testified that the claimant's low-back pain would not have masked his knee problems, especially if he had sustained structural damage to the knee at the time of his fall. He was of the opinion that, although some bone edema or bleeding in the patella is consistent with a stress fracture, those same conditions could also be the result of a degenerative process in the claimant's knee. Dr. Mercier also opined that the claimant was not a candidate for either arthroscopic surgery or epidural steroid injections. Dr. Mercier testified that, as of the date of his examination, the claimant had reached maximum medical improvement (MMI) with respect to both his back and knee and could have resumed full-duty work.

On referral from Dr. Cavazos, the claimant was examined by Dr. David Montella, an orthopaedic surgeon, on June 24, 2004. The doctor's notes reflect that the claimant complained of low-back pain extending down his right leg and right knee pain with some swelling and giving way. Dr. Montella testified that the claimant denied any locking, catching or popping in his right knee. On examination, Dr. Montella detected an antalgic gait and limited lumbar flexion and extension. He also noted lumbar spasms, negative tension signs, and a mild knee effusion with tenderness about the patella and joint lines. However, he testified that the tests which he performed for ligament instability which produced negative results have limited sensitivity. Dr. Montella interpreted the claimant's MRI scans as showing a questionable chondral fracture of the right knee and a central protrusion at L4-L5 with an annular tear. Dr. Montella prescribed lumbar epidural injections, right knee surgery, and continued chiropractic care. He also recommended that the claimant remain off work due to his severe and debilitating conditions. However, at the claimant's request, Dr. Montella released the claimant to return to full-duty work on July 9, 2004.

When he saw the claimant on August 12, 2004, Dr. Montella noted that his examination findings remained unchanged, and he continued to recommend epidural injections and knee surgery. Noting that the claimant wanted to attempt to work, Dr. Montella authorized him to return to light-duty work with a 40-pound lifting limitation and a restriction against excessive turning, twisting, bending, sitting, or standing. However, Dr. Montella advised the claimant that he might be required to cease working in the event that his symptoms worsened.

The claimant testified that he presented his supervisor with the restrictions imposed by Dr. Montella, and R&D provided him with light-duty work. However, he complained to Dr. Montella of neck pain and headaches on October 22, 2004, which were not work-injury related and asked Dr. Montella to authorize him to remain off work due to his back and knee pain. Dr. Montella complied with the request.

Dr. Montella's notes indicate that there was no change in the claimant's physical condition when he saw him in August, September, October, and December of 2004, and February of 2005. However, Dr. Montella's diagnosis changed over that period from a knee fracture and an L4-L5 annular tear on June 24, 2004; to back and knee pain on August 12, 2004; to neck pain with headache and low-back pain, right knee pain, cervical and lumbar discogenic pain, and a right knee meniscal tear on October 22, 2004; to back and radiating leg pain and lumbar disk injury on December 23, 2004; to back pain and lumbar discogenic pain leading to radiculitis on February 9, 2005.

Dr. Montella's February 9, 2005, notes state that the claimant had "no profound or progressive neurologic impairment" and "knee pain consistent with inter-articular pathology." Although he believed that a lumbar fusion was an option of last resort, Dr. Montella continued to recommend therapy, chiropractic treatment, epidural injections and arthroscopic surgery, and he authorized the claimant to remain off work.

When Dr. Montella examined the claimant in April, June and August of 2005 and in March and April of 2006, there was again no change in his physical findings. Dr. Montella testified that the claimant has a disk herniation with radicular irritation and an annular tear which is causing back pain and is leading to nerve irritation. He stated that the claimant's knee and low-back injuries are causally related to his work accident, although he conceded that the MRI of the claimant's knee showed no evidence of a meniscal tear.

At R&D's request, the claimant was examined on March 17, 2006, by Dr. Alexander Ghanayem. In his report of that examination, the doctor recorded the history given him by the claimant of having fallen 10 to 12 feet from a ladder while working and landing on his back and right side. The claimant complained of back pain, neck pain, pain in his right buttock, and pain in his posterior thigh to his calf. Dr. Ghanayem noted the results of his physical examination of the claimant, and the medical records which he reviewed, including the MRI of the claimant's lumbar spine. According to Dr. Ghanayem, the MRI appeared normal. He found no evidence of an annular tear. He did detect evidence of some thickening of the annulus at L4-L5, but found the condition to be appropriate for an individual of the claimant's age and

not of traumatic origin. Based upon the mechanism of the claimant's injury, his examination of the claimant, and his review of the claimant's medical records, Dr. Ghanayem opined that the claimant had sustained soft-tissue injuries to his back, right buttock, and thigh. He found no evidence that the claimant sustained a disk herniation that would result in any permanent injury. Dr. Ghanayem was also of the opinion that the claimant had reached MMI, and that he was capable of returning to full-duty work. Although he opined that chiropractic care two to three times per month for one or two months was appropriate for the claimant's injuries, he characterized the chiropractic care that the claimant received over a two-year period as "inappropriate and not medically necessary."

When deposed on November 10, 2005, Dr. Cavazos testified that he had seen the claimant 131 times since January 6, 2004. He stated that most of the therapy which he administered was for the claimant's back rather than his knee.

The claimant testified at the arbitration hearing held in May of 2006, that he had seen Dr. Cavazos more than 140 times since his injury on January 5, 2004, and that the treatments helped him "a little."

R&D had the records of Drs. Cavazos and Montella along with their depositions reviewed by Dr. Lawrence Humberstone, a chiropractor. In his report, Dr. Humberstone opined that it would be "atypical" for a transchondral fracture of the knee to produce intermittent pain almost one month after the injury occurred. He wrote that the first 12 chiropractic visits to Dr. Cavazos were necessary, reasonable, and related to the claimant's work accident. However, he fixed January 30, 2004, as the date when the claimant had reached MMI for purposes of chiropractic treatment. Dr. Humberstone did not believe that the records supported the amount of chiropractic care that the claimant received, and he found no evidence that the claimant received any real benefit from the treatments. Dr. Humberstone also opined that none of the claimant's knee-related care was either reasonable or related to his injury at work.

The claimant acknowledged that he did not mention any right knee pain when he first saw Dr. Cavazos and that he first complained of right knee problems when he saw Dr. Cavazos on January 20, 2004. The claimant also admitted that, although R&D still had light-duty work available, he had not contacted R&D or looked for alternative work since October 22, 2004.

Following the hearing held pursuant to section 19(b) of the Act (820 ILCS 305/19(b) (West 2004)), the arbitrator found that the claimant sustained a work-related accident on January 5, 2004, resulting in

soft-tissue injuries to his low back. The arbitrator awarded the claimant $26^6/_7$ weeks of temporary total disability benefits under section 8(b) of the Act (820 ILCS 305/8(b) (West 2004)) and ordered R&D to pay $8,070.50 for necessary medical services provided to the claimant pursuant to section 8(a) of the Act (820 ILCS 305/8(a) (West 2004)), limiting the amount due Dr. Cavazos to $5,275. R&D was granted a credit of $3,659.32 pursuant to section 8(j) of the Act (820 ILCS 305/ 8(j) (West 2004)). After concluding that the credibility of both the claimant and Dr. Montella was in serious question, the arbitrator declined to find any causal relationship between the claimant's work-related accident and his current condition of ill-being. As a consequence, she declined to order R&D to pay for any prospective epidural injections or a right knee arthroscopy.

The claimant filed a petition for review of the arbitrator's decision before the Commission. The Commission modified the arbitrator's decision, finding that the claimant met his burden of establishing a causal connection between his accident on January 5, 2004, and his current condition of ill-being, specifically his lumbar spine abnormalities, his right knee osteochondral fracture, and a possible meniscal tear. Finding that R&D had paid Dr. Cavazos $5,480, the Commission increased the sum which R&D was ordered to pay for necessary medical services provided to the claimant to $8,275.50. The Commission ordered R&D to authorize and pay for epidural injections and a diagnostic arthroscopy of the claimant's right knee. In addition to the $3,659.32 section 8(j) credit awarded by the arbitrator, the Commission awarded R&D an additional credit in the sum of $5,480 for the payments made to Dr. Cavazos. In all other respects, the Commission affirmed the arbitrator's decision and remanded the matter to the arbitrator for further proceedings pursuant to *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327, 399 N.E.2d 1322 (1980).

Thereafter, R&D sought judicial review of the Commission's decision in the circuit court of Cook County. The circuit court confirmed the Commission's decision, and this appeal followed.

In urging reversal of the judgment of the circuit court, R&D argues that the Commission's decision finding a causal relationship between the claimant's accident at work on January 5, 2004, and the current condition of ill-being of his lumbar spine and right knee is against the manifest weight of the evidence. In a dependent argument, R&D contends that the Commission's award of prospective medical expenses is also against the manifest weight of the evidence. In support of its arguments, R&D relies upon the causation opinions of Drs. Mercier, Ghanayem and Humberstone. According to R&D, the Commission "cherry picked" through Dr. Mercier's testimony and ignored

significant portions of his opinions. R&D also asserts Dr. Montella's records and opinions "strain the limits of credibility," pointing to his frequent changes in diagnoses despite the claimant's unchanging physical examinations, and it concludes that the Commission's findings "defy logic" and are both "nonsensical and inconsistent."

Ignoring the hyperbole, we will address R&D's arguments along with its invitation for us to apply an "extra degree of scrutiny" in cases such as this where the Commission rejects the credibility findings of an arbitrator.

In *S&H Floor Covering, Inc. v. Workers' Compensation Comm'n*, 373 Ill. App. 3d 259, 267, 870 N.E.2d 821 (2007), responding to "more than a few cases where the Commission has made credibility findings contrary to those of the arbitrator," this court opined that "[i]t may very well be time to reconsider the Commission's prerogative to determine credibility regardless of the arbitrator's decision." However, recognizing, as we must, that the Commission exercises original jurisdiction and is not bound by an arbitrator's findings (see *Franklin v. Industrial Comm'n*, 211 Ill. 2d 272, 279, 811 N.E.2d 684 (2004); *Paganelis v. Industrial Comm'n*, 132 Ill. 2d 468, 483, 548 N.E.2d 1033 (1989); *Berry v. Industrial Comm'n*, 99 Ill. 2d 401, 405, 459 N.E.2d 963 (1984)), we are, nevertheless, faced with the obligation of determining whether the Commission's credibility findings that are contrary to those of the arbitrator are against the manifest weight of the evidence. A resolution of the question can only rest upon the reasons given by the Commission for the variance. When the Commission gives no reasons for a contrary credibility determination, its decision may be lacking in findings that make meaningful judicial review possible; and in such cases, the appropriate remedy is to remand the matter to the Commission with directions to make the necessary findings. See *Reinhardt v. Board of Education of Alton Community Unit School District No. 11*, 61 Ill. 2d 101, 103-04, 329 N.E.2d 218 (1975); *Illinois Campaign for Political Reform v. Illinois State Board of Elections*, 382 Ill. App. 3d 51, 63, 886 N.E.2d 1220 (2008). However, when, as in this case, the Commission gives its reasons for making credibility findings contrary to those made by the arbitrator, our inquiry on review is whether the findings are against the manifest weight of the evidence. *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253, 403 N.E.2d 221 (1980). Whether this court might have reached the same conclusion is not the test of whether the Commission's determination is supported by the manifest weight of the evidence. Rather, the appropriate test is whether there is sufficient evidence in the record to support the Commission's determination. *Benson v. Industrial Comm'n*, 91 Ill. 2d 445, 450, 440 N.E.2d 90 (1982).

In this case, the arbitrator, relying upon the opinion of Dr. Ghanayem, concluded that the claimant sustained only a soft-tissue injury to his low back as a result of his fall at work on January 5, 2005, and, although he also injured his right knee when he fell, he failed to prove that he sustained any permanent injury to the knee or was in need of any surgery. The arbitrator found Dr. Ghanayem's opinions more credible that those of Drs. Cavazos and Montella. In coming to her conclusions, the arbitrator also rejected the opinions of Drs. Freedberg and Montella as to the nature and extent of the claimant's knee injury because their opinions are not supported by the MRI of the claimant's knee. She found Dr. Montella's opinions less than credible due to his frequent changes in diagnoses.

In contrast, the Commission found that the claimant proved that he sustained an L4-L5 disk protrusion and annular tear as well as an osteochondral patellar fracture and possible meniscal tear of the right knee as a result of his work-related fall. In arriving at its decision, the Commission relied upon the consistency of the claimant's descriptions of the mechanism of his injury; the MRIs of the claimant's lumbar spine and right knee; the opinions of Drs. Freedberg, Montella and Cavazos; and the concessions made by Dr. Mercier in his deposition. The Commission noted that Dr. Mercier conceded that the MRI of the claimant's lumbar spine showed a central disk protrusion at L4-L5 and a small annular tear in contrast to Dr. Ghanayem's opinion that the claimant suffered only soft-tissue injuries. Contrary to the arbitrator's finding that Dr. Freedberg's opinion was not supported by either the claimant's MRI or his own examination of the right knee, the Commission observed that Dr. Freedberg based his opinions not only on a review of the claimant's MRI, but also on a review of multiple X-rays that he had ordered. As to the opinions of Dr. Humberstone, the Commission noted that he never examined the claimant. Finally, relying upon the recommendations of Drs. Freedberg, Montella, and Mercier, the Commission ordered R&D to authorize and pay for epidural injections to the claimant's lumbar spine and a right knee arthroscopy.

In a workers' compensation case, the claimant has the burden of proving, by a preponderance of the evidence, all of the elements of his claim. *O'Dette*, 79 Ill. 2d at 253. Whether a causal relationship exists between a claimant's employment and his injury is a question of fact to be resolved by the Commission (*Certi-Serve, Inc. v. Industrial Comm'n*, 101 Ill. 2d 236, 244, 461 N.E.2d 954 (1984)), as is the extent of his disability (*Oscar Mayer & Co. v. Industrial Comm'n*, 79 Ill. 2d 254, 256, 402 N.E.2d 607 (1980)) and the reasonableness and necessity of medical expenses (*F&B Manufacturing Co. v. Industrial Comm'n*,

325 Ill. App. 3d 527, 534, 758 N.E.2d 18 (2001)). In resolving such issues, it is the function of the Commission to decide questions of fact, judge the credibility of witnesses, and resolve conflicting medical evidence. *O'Dette*, 79 Ill. 2d at 253.

The Commission's determinations on questions of fact will not be disturbed on review unless they are against the manifest weight of the evidence; that is to say, unless an opposite conclusion is clearly apparent. *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 44, 509 N.E.2d 1005 (1987).

As the trier of fact, exercising original jurisdiction, the Commission resolved the issues of the nature and extent of the claimant's injuries and the reasonableness and necessity of his prospective medical expenses, as well as the question of whether a causal relationship exists between the claimant's condition of ill-being and his fall at work on January 5, 2004. Although in some respects contrary to the findings of the arbitrator, we cannot say based upon the record before us that the Commission's decision is contrary to the manifest weight of the evidence.

Based upon the foregoing analysis, we affirm the judgment of the circuit court which confirmed the Commission's decision, and we remand the matter to the Commission for further proceedings.

Affirmed and remanded to the Commission.

McCULLOUGH, P.J., and HUDSON, HOLDRIDGE, and DONOVAN, JJ., concur.