2020 IL App (2d) 190720WC-U
No. 2-19-0720WC
Order Filed October 13, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

Workers' Compensation Commission Division

| | | |
|---|---|---|
| AC McCARTNEY FARM EQUIPMENT, | ) | Appeal from the Circuit Court |
| | ) | Winnebago County, |
| Appellant, | ) | |
| | ) | |
| v. | ) | No. 18-MR-823 |
| | ) | |
| THE ILLINOIS WORKERS' | ) | |
| COMPENSATION COMMISSION *et al.* | ) | Honorable |
| | ) | Lisa Fabiano, |
| (David Fink, Appellee). | ) | Judge, Presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the judgment of the circuit court setting aside the decision of the Illinois Workers' Compensation Commission and reinstating the decision of the arbitrator where the Commission's finding that claimant failed to prove entitlement to an award of permanent total disability benefits under the odd-lot theory was against the manifest weight of the evidence.

¶ 2    Employer, AC McCartney Farm Equipment (AC), appeals from an order of the circuit court of Winnebago County which (1) set aside the decision of the Commission awarding claimant, David Fink, permanent partial disability (PPD) benefits under section 8(d)(2) of the Illinois Workers Compensation Act (Act) (820 ILCS 305/8(d)(2) (West 2012)), and (2) reinstated the

decision of the arbitrator awarding claimant permanent total disability (PTD) benefits under section 8(f) of the Act (820 ILCS 305/8(f) (West 2012)). For the following reasons, we affirm the judgment of the circuit court.

¶ 3                                      I. Background

¶ 4      On January 27, 2012, claimant filed an application for adjustment of claim pursuant to the Act, seeking benefits for injuries he sustained to his right knee when he stepped down from a forklift while working for AC on April 19, 2011. On that same day, he filed an amended application for adjustment of claim (12-WC-03215), seeking benefits for injuries he sustained to both his right and left knees when he stepped down from the forklift while working for AC on April 19, 2011. Claimant later filed a second application for adjustment of claim (12-WC-11480), seeking benefits for injuries he sustained to his back and shoulder while installing a combine transmission while working for AC on August 3, 2010.

¶ 5      On March 1, 2017, a consolidated arbitration hearing was conducted on the applications filed by claimant. The following factual recitation is taken from the evidence adduced at the hearing. We recite only those facts necessary to our resolution of the issues on appeal.

¶ 6                                  A. Claimant's Testimony

¶ 7      Claimant, who was 57 years old at the time of the arbitration hearing, began working after he dropped out of high school during his freshman year. Claimant primarily worked as a mechanic and farmhand at several agricultural businesses but also worked as a mechanic at several factories. Claimant worked as a mechanic at the same agricultural business for approximately 10 years until it was purchased by AC in July 2008. Following the purchase, claimant began working for AC as a set-up mechanic. In addition to setting up and assembling agricultural equipment, he performed mechanical repairs to combines and other farm machinery. His job duties required him to lift and

carry machine parts, weighing 25 to 150 pounds, while he used a "fork truck" to move heavier parts.

¶ 8    Claimant sustained two separate injuries while working for AC. He first injured his right shoulder and lower back on August 3, 2010, while repairing a combine transmission. As a result, claimant missed several days of work and received approximately 10 chiropractic treatments. Claimant next injured his right knee on April 19, 2011, when he stepped two-and-a-half-feet down from a forklift platform and landed wrong, possibly on a rock. He specifically recalled twisting his right knee as his foot landed and feeling an immediate, sharp pain. He managed to walk back to AC's shop before seeking emergency treatment for his right knee at Memorial Hospital. After x-rays of his right knee revealed no abnormalities, he was advised to see a specialist, given crutches and prescribed pain pills. Claimant sought additional treatment for his right knee and did not return to work for an extended period following the April 19, 2011, accident.

¶ 9    In the following weeks, claimant made an appointment with Dr. Matthew Bruns, a practitioner at Quincy Medical Group. He was also seen by Dr. Kelly Rife, his family physician, and Dr. Adam Derhake, an orthopedic surgeon. Dr. Derhake ordered magnetic resonance imaging (MRI) of claimant's right knee and restricted claimant from lifting over 15 pounds. Dr. Derhake later reviewed the MRI and recommended that claimant undergo surgery on his right knee, which was scheduled for July 2011.

¶ 10    On July 4, 2011, prior to having surgery, claimant's right knee buckled, causing him to fall down a flight of stairs at his home. As a result, he sustained additional injuries to his left knee and right shoulder. While claimant had prior issues with his right shoulder as a result of the August 3, 2010, accident, he had no issues with his left knee before the July 4, 2011, fall. Claimant denied having any prior injuries to his right knee before the April 19, 2011, accident, but he recalled that

his right knee had buckled on several occasions while he was walking on flat surfaces after the accident. On cross-examination, claimant acknowledged that he had previously received treatment for his right knee, which included injections, from Dr. Jean Cross approximately three years before the April 19, 2011, accident.

¶ 11 Claimant did not seek emergency medical care because he was advised that the additional injuries resulting from the July 4, 2011, fall would not be covered under workers' compensation. However, he presented to both Drs. Rife and Derhake the following day to ensure that his additional injuries would not impact his upcoming knee surgery. Several days later, Dr. Derhake performed surgery on claimant's right knee. Claimant attended several physical therapy sessions after the surgery but later decided to change orthopedic surgeons due to ongoing issues with his right knee.

¶ 12 On September 14, 2011, claimant presented to Dr. Curtis D. Burton, an orthopedic surgeon, complaining of ongoing pain in his right knee following surgery. After reviewing claimant's scans and medical records, Dr. Burton conducted a physical examination and ultimately administered a series of steroid injections to claimant's right knee.

¶ 13 Claimant remained off work until January 2012. At that time, he began performing light-duty work at AC, which included filing papers and driving a co-worker, who had recently lost his license, to different locations to pick up machinery. After approximately three months, Mr. McCartney, a manager and owner of AC, requested that claimant return to his previous position as a full-time mechanic. Claimant was laid off after advising Mr. McCartney that he could not return to his former position with his injuries and work restrictions, and he has received no additional employment offers from AC.

¶ 14 Claimant received temporary total disability (TTD) benefit payments from AC for approximately one year after the April 19, 2011, injury. AC also paid claimant's initial medical bills, but the payments stopped after his knee surgery. According to claimant, AC stopped all payments after he was examined by an "independent doctor" in St. Louis, Missouri. On cross-examination, claimant admitted that he presented to Dr. Richard Lehman for an independent medical evaluation (IME) on February 2, 2012, while he was performing light-duty work at AC. Claimant also recalled that the IME took place shortly before his discussion with Mr. McCartney.

¶ 15 Claimant applied for, and later received, Social Security Disability and Medicare. He also spoke on the phone with Lisa Helma, a vocational counselor with Vocamotive, about obtaining employment that would accommodate his work restrictions of limited lifting and standing. However, claimant has not secured additional employment since losing his job at AC. On cross-examination, claimant explained that he had attempted to find another job and conducted two job searches per week for 20 weeks. According to claimant, he found two possible employers "that would probably have hired [him] if [he] didn't have bad knees and would be able to walk," but he was not offered a job. Claimant also admitted that he has a valid commercial driver's license (CDL).

¶ 16 Claimant continues to experience pain, stiffness and popping in his right knee, as well as pain, discomfort, stiffness and locking sensations in his left knee. Claimant also continues to experience pain, stiffness, a limited range of motion and loss of strength in his right shoulder. Dr. Burton recommended surgery on his left knee and right shoulder, but claimant never had the recommended surgeries because he was advised that neither workers' compensation nor his insurance would cover the cost.

¶ 17 B. Medical Evidence

¶ 18     The medical records from Memorial Hospital show that claimant presented to the emergency room complaining of right knee pain on April 19, 2011. Claimant was prescribed pain medication, given a knee immobilizer and instructed to follow up with an orthopedist. Claimant underwent a right knee MRI on May 19, 2011, and the reviewing radiologist noted the following impressions: a complex degenerative tear involving the entire lateral meniscus with both horizontal and radial components with an associated anterior extrusion in the anterior horn of the lateral meniscus; mild to moderate tricompartmental osteoarthritis; associated knee joint effusion and intraarticular bodies; and intact cruciate and collateral ligaments.

¶ 19     Claimant presented for appointments with Dr. Derhake on May 31, 2011, and June 6, 2011. After reviewing the MRI of claimant's right knee, Dr. Derhake diagnosed claimant with a complex lateral meniscal tear with a possible tear in his medial meniscus. Dr. Derhake recommended that claimant undergo a right knee arthroscopy with possible meniscectomy and a possible chondroplasty for definitive management of the condition. Dr. Derhake released claimant to work with restrictions while he awaited authorization for surgery.

¶ 20     Dr. Derhake performed the recommended surgery on July 7, 2011, and he directed claimant to remain off work. At a follow-up appointment on July 21, 2011, Dr. Derhake released claimant to work under the following restrictions: no climbing stairs or ladders, no repetitive bending of his right knee and no kneeling or squatting. Dr. Derhake also recommended that claimant remain seated 75% of the time. However, at claimant's next follow-up visit on August 12, 2011, Dr. Derhake recommended that claimant remain off work.

¶ 21     Claimant first presented to Dr. Burton at Midwest Orthopedic Specialists on September 14, 2011. Dr. Burton noted that "[i]t would be somewhat tough for [claimant] to return to work because of the kneeling and the sensitivity he has on the front of his knee, but I think this could be

accomplished as he appears now." Dr. Burton also noted that he would seek authorization for Supartz shots. Dr. Burton reported that claimant was unable to return to work in October 2011.

¶ 22    In November 2011, Dr. Burton administered a series of injections in claimant's right knee and reported that claimant was unable to return to work. In addition, claimant underwent a left knee MRI at Memorial Hospital. The reviewing radiologist noted the following impressions: knee effusion with a Baker cyst; presumed reactive type synovitis and particulate debris; moderate osteoarthritis; complex lateral meniscal tears; and focal deformity of increased T2 signal distal popliteal tendon, which likely represented an old post-traumatic change. After reviewing the MRI, Dr. Burton agreed with the noted impressions and recommended that claimant undergo a lavage arthroscopy on his left knee. Dr. Burton also noted that claimant was complaining of pain in his right shoulder.

¶ 23    Claimant presented to Dr. Burton for a follow-up appointment on December 21, 2011. Dr. Burton noted that claimant "is pessimistic that he is going to be able to return to his previous level of activity and previous job, and I am as well, given the fact that he has extensive degenerative change in the knee." Dr. Burton opined that claimant's knee condition was "in fact worsened by his arthroscopy and only marginally improved with injections." Dr. Burton reported that claimant could work light-duty with a lift limit of 10 pounds, as well as a standing limit of one continuous hour and no more than three hours per day.

¶ 24    Dr. Burton prepared a report to AC regarding claimant's medical conditions on January 23, 2012. Dr. Burton noted that claimant had been scheduled for an IME and again reported that claimant could perform light-duty work with the previously recommended lifting and standing restrictions.

¶ 25    Dr. Lehman examined claimant at AC's request on February 2, 2012, and prepared a report setting forth his findings and opinions with regard to claimant's condition. Dr. Lehman opined that claimant had a moderate disability due to the following conditions: pre-existing arthritis; patella alta and degenerative arthritis in the lateral aspect of both knees; and impingement syndrome with a possible rotator cuff pathology in his right shoulder. While Dr. Lehman agreed that claimant needed treatment for these conditions, he opined that claimant was capable of returning to work without restrictions and that claimant's conditions were unrelated to his work injury.

¶ 26    On April 13, 2012, claimant underwent a right shoulder MRI. The reviewing radiologist noted the following impressions: osteoarthritis of the right shoulder; partial thickness tears involving the rotator cuff tendon with a focal full thickness tear; partial tear with tendinopathy involving the long head of the tendon in the bicep. Several days later, claimant was seen by Dr. Burton, who recommended that claimant undergo an arthroscopy of his right shoulder, fixation of the tendon in his bicep, possible repair of his rotator cuff and an evaluation of the articular surfaces.

¶ 27    On June 1, 2012, Dr. Burton prepared a letter setting forth his findings and opinions regarding claimant's condition. Dr. Burton opined that claimant had permanent restrictions of limited standing, kneeling and flexibility in both knees. Dr. Burton further opined that claimant could return to work if his limitations could be accommodated but noted that claimant would ultimately require bilateral knee arthroplasties. Dr. Burton also noted that claimant had some limitations in the function of his shoulder and recommended an additional evaluation for his shoulder in the form of arthroscopy.

¶ 28                    C. Social Security Administration Disability Award

¶ 29    On May 2, 2012, claimant filed an initial claim for disability. Claimant later received a letter, dated September 18, 2012, from the Social Security Administration (SSA) advising that he

was entitled to monthly disability benefits beginning October 2011. Claimant also received a document titled "Disability Determination Explanation," which provided the following details regarding his disability claim. The document was signed by Hemantha Surath, a medical doctor, and Tiffany Miller, a disability adjudicator employed by the SSA. Claimant, who was approximately 53 years old at the time, was found to be closely approaching advanced age. Based on a review of claimant's medical records, Dr. Surath determined that claimant suffered from severe osteoarthrosis and allied disorders. Dr. Surath accorded no weight to Dr. Lehman's medical opinions because they were inconsistent with his objective medical findings. With regard to claimant's residual functional capacity, Dr. Surath noted that claimant could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for a total of four hours, sit with normal breaks for a total of six hours and occasionally climb, stoop, kneel, crouch and crawl.

¶ 30    Miller performed an assessment of vocational factors and listed claimant's work history for the past 15 years. Miller noted claimant's employment as a set-up mechanic, which was classified as a skilled-level position, dated back to 1997. Miller concluded that claimant's past work history exceeds his current functional levels and that claimant could only perform sedentary work due to his physical limitations. Miller also noted that a vocational assessment of claimant was conducted by Robin Power, who concluded that claimant was unable to return to his past work and that his acquired skills would not transfer to sedentary occupations, especially given his age.

¶ 31                               D. Helma's Report

¶ 32    On September 16, 2014, Helma, a certified rehabilitation counselor, prepared an evaluation report after conducting a telephonic interview with claimant on August 25, 2014, and reviewing claimant's medical records. Helma's report demonstrates that claimant, who was then 55 years old, provided a consistent history of the injuries he sustained on August 3, 2010, April 19, 2011,

and July 4, 2011. Claimant indicated that his knee condition made it difficult for him to get in and out of his car or drive for more than one hour, but he admitted that his knees did not bother him when he was inactive. He also indicated that he could lift no more than 10 pounds, he had to change positions after sitting for 15 to 30 minutes and he was unable to bend, kneel or crawl. Claimant's doctor had advised claimant that he would require a bilateral knee replacement in the future but instructed him to wait until he was 59 years old.

¶ 33     Helma considered the opinions of Drs. Burton and Lehman in her report. Specifically, Dr. Burton's opinion that claimant's work-related injury exacerbated his preexisting arthritis in his knee and that he has permanent restrictions of limited standing and flexibility in both knees. Helma also noted Dr. Burton's opinion that claimant could return to work if he could obtain employment that would accommodate his restrictions, along with Dr. Burton's opinion that claimant would ultimately require bilateral knee arthroplasties. Helma also considered Dr. Lehman's contrary opinion that claimant was capable of returning to work without restrictions, despite having a moderate disability relating to his knee and shoulder conditions. Helma noted that Dr. Lehman also opined that claimant needed treatment for his conditions and agreed with Dr. Burton that claimant may eventually need a total right knee replacement.

¶ 34     With regard to claimant's educational history and skills, Helma noted that claimant dropped out of high school during his freshman year and never obtained a GED. Claimant reported that he possessed mechanical skills and had occasionally participated in a mechanic class through work. He was able to use his home computer to send emails without attachments and to check the weather, but he denied having any keyboarding or software skills. Claimant also reported that he had a valid Class B driver's license that allowed him to operate a two-ton truck, which was "right below a semi license."

¶ 35    Helma's report also includes a thorough review of claimant's past work history, as described by claimant. He reported that he first worked at a lumber yard where he loaded and delivered lumber, filled racks with lumber and assisted carpenters in building houses. Claimant then worked on farms with livestock and crops for 10 years. Next, he worked for four or five years as an apprentice machine operator at a factory that made liners for landfills. In this position, he loaded and started machines that made rolls of plastic. He then worked for four or five years as a set-up mechanic and night shift supervisor at a company where he set up machines, operated machines and loaded dyes or wires into machines. He next worked for four years at a farm supply company where he assembled livestock equipment, loaded feed, worked on the farm, fixed power washers, delivered equipment, along with other miscellaneous tasks. He then worked for 10 years as a set-up mechanic at a company where he assembled farm machinery, performed mechanical work on tractors and combines, drove a truck to deliver farm equipment, operated a forklift, installed parts on combines, loaded trucks and performed some welding. Most recently, he worked for five years as a set-up mechanic at AC where he earned $13 per hour and performed similar work to his previous job as a set-up mechanic but with less driving. Claimant also reported that he had returned to light-duty work at AC, which included filing papers and driving a truck, following his knee surgery.

¶ 36    Before rendering her opinion on claimant's employability, Helma noted that she did not have an opportunity to meet claimant in person and, thus, was unable to evaluate his personal presentation. Helma, instead, formulated her opinion based on her consideration of claimant's age, education, work experience, physical capabilities, transferable skills and elements of acquired disability. In considering these factors, Helma opined that claimant's limited education and advanced age would negatively affect his ability to adjust to other work. In reviewing claimant's

work experience, Helma noted that claimant's past jobs most closely resembled the following positions: farm equipment mechanic, which was classified as a skilled position at the medium level of physical demand; light truck driver, which was classified as a semi-skilled position at the medium level of physical demand; industrial truck operator, which was classified as a semi-skilled position at the medium level of physical demand; general farmworker, which was classified as an unskilled position at the heavy level of physical demand; machine operator, which was classified as a semi-skilled position at the medium level of physical demand; and a construction worker, which was classified as a semi-skilled position at the heavy level of physical demand.

¶ 37    In evaluating claimant's physical capabilities, Helma relied on Dr. Burton's opinions and recommended restrictions, which included limited standing, kneeling and flexion in both knees. Helma opined that claimant's permanent physical restrictions, as recommended by Dr. Burton, "would most closely correlate with [s]edentary types of occupations." However, Helma opined that claimant lacked any transferrable skills for sedentary types of employment, due to his education level, lack of computer skills, history of physically demanding jobs and current physical limitations. Helma, relying on statistical data prepared by the United States Department of Labor, noted that sedentary occupations "comprise of approximately 11% of the United States labor market, with the vast majority of these occupations being classified at the skilled to highly skilled level." Helma also noted that sedentary unskilled occupations "comprise of approximately 1% of the United States labor market." Helma further noted that claimant lives in a rural area with limited employment options. Based on her consideration of Dr. Burton's medical opinions, as well as claimant's age, education, work experience, physical capabilities, transferable skills and elements of acquired disability, Helma opined that claimant had lost access to his previous work as a set-up

mechanic and that he had lost access to any stable labor market. Thus, Helma concluded that claimant's "disability is total."

¶ 38                                  E. Arbitrator's Decision

¶ 39    Following the hearing, the arbitrator issued a decision finding that claimant had sustained accidental injuries arising out of and in the course of his employment with AC on April 19, 2011, and that his current conditions of ill-being were causally connected to the work accident. Accordingly, the arbitrator awarded claimant reasonable and necessary medical expenses in the amount of $2,200.50 pursuant to section 8(a) and 8.2 of the Act (820 ILCS 305/8(a) (West 2012); 820 ILCS 305/8.2 (West 2012)), but ordered that AC receive a credit in the amount of $25,961.03 for all previously paid medical benefits pursuant to section 8(j) of the Act. 820 ILCS 305/8(j) (West 2012). The arbitrator also awarded claimant TTD benefits for the period of April 19, 2011, through January 3, 2012, and the period of March 30, 2012, through August 1, 2012, but ordered that AC receive a credit in the amount of $13,777.23 for previously paid TTD benefits. Lastly, the arbitrator awarded claimant PTD benefits in the amount of $466.13 per week for life, commencing on August 2, 2012. In support of the PTD award, the arbitrator found that (1) claimant proved entitlement to PTD benefits under an "odd-lot" category by introducing Helma's opinions, along with evidence of his receipt of Social Security disability benefits, which showed that there were no available jobs for him, given his age, training, education, experience and condition, and (2) AC failed to meet its burden of showing that suitable, regular and continuous work is available to claimant by either providing claimant with light-duty work or introducing the opinions of a vocational expert. AC sought review of the arbitrator's decision before the Commission.

¶ 40                                  F. Commission's Decision

¶ 41     On review, the Commission issued a decision which modified the arbitrator's decision by vacating the arbitrator's award of PTD benefits and, instead, awarding claimant PPD benefits for 50% loss of use of his person as a whole in the amount of $312.00 per week for a period of 250 weeks. In support, the Commission found that claimant did not prove his entitlement to PTD benefits because there was no medical evidence to support a claim of total disability and he failed to establish that he fell into the odd-lot category. The Commission, unlike the arbitrator, found Helma's opinion unpersuasive because she never personally met claimant and did not have an opportunity to evaluate his personal presentation. The Commission also found Helma's opinion confusing because she stated that claimant "has no transferable skills, and that sedentary, unskilled occupations comprise 1% of the labor market" but also noted his "extensive history of skilled work, not all of which encompass heavy duty work." After considering claimant's experience, skills and "the fact that he earned $13.00 per hour with [AC]," the Commission could not say that claimant was unable to secure permanent employment.

¶ 42     The Commission next found that claimant "implicitly waived" his right to a wage differential award by failing to present evidence to demonstrate entitlement to such an award. The Commission specifically noted that the evidence was insufficient "to determine whether suitable employment, in which [claimant] is both able and qualified to perform, is available," or whether the employment, if available, would result in an impairment of earnings. The Commission, instead, found the evidence supported an award of 50% loss of use of the person as a whole. In support, the Commission noted that claimant suffered complex lateral meniscal tears to both knees as a result of the April 19, 2011, accident, and that he also suffered tears in his rotator cuff and tendon in his bicep. The Commission also noted that Dr. Burton and Helma both opined that claimant could not return to his previous activity level or his previous job with AC due to his knee and

shoulder conditions. Thus, the Commission vacated the award of PTD benefits and, instead, awarded claimant 50% loss of use of the person as a whole. The Commission affirmed and adopted the arbitrator's decision in all other respects. Claimant sought judicial review of the Commission's decision in the circuit court of Winnebago County.

¶ 43                                    G. Circuit Court's Decision

¶ 44    Following a hearing, the circuit court determined that the Commission's finding that claimant failed to establish entitlement to PTD benefits by showing he fell within the odd-lot category was against the manifest weight of the evidence. Thus, the court set aside the Commission's decision and reinstated the arbitrator's decision. AC now appeals.

¶ 45                                              II. Analysis

¶ 46    On appeal, AC argues that the circuit court erred in finding that the Commission's decision to award claimant 50% loss of use of the person as a whole was against the manifest weight of the evidence. In contrast, claimant argues that the Commission's decision to vacate the arbitrator's award of PTD benefits for life under the odd-lot theory was both contrary to the law and against the manifest weight of the evidence.

¶ 47                              A. Scope and Standard of Review

¶ 48    While the parties' arguments reference the decisions of both the arbitrator and circuit court, we are mindful that the Commission is the "ultimate decisionmaker" in workers' compensation proceedings. *Interstate Scaffolding, Inc. v. Illinois Workers' Comp. Comm'n*, 236 Ill. 2d 132, 145 (2010). "[W]hen an appeal is taken to the appellate court following entry of judgment by the circuit court on review from a decision of the Commission, we review the ruling of the Commission, not the judgment of the circuit court." *Dodaro v. Illinois Workers' Comp. Comm'n*, 403 Ill. App. 3d 538, 543 (2010). Accordingly, although the circuit court reinstated the arbitrator's award of PTD

benefits, we review the Commission's decision to vacate the award of PTD benefits under the odd-lot theory and, instead, award claimant 50% loss of use of the person as a whole.

¶ 49    "The standard of review we apply—which determines the level of deference afforded the Commission's decision—depends on whether the issue presented on appeal is one of fact, one of law, or a mixed question of fact and law." *Dodaro*, 403 Ill. App. 3d at 544. Here, the parties' dispute centers on the Commission's determination that claimant failed to prove his entitlement to PTD benefits under the odd-lot theory. Claimant initially asserts that *de novo* review is appropriate because the Commission misapplied the law in making this determination. AC asserts that the Commission's determination on this issue presents a question of fact subject to the manifest-weight-of-the-evidence standard. We agree with AC.

¶ 50    Whether a claimant is permanently and totally disabled is a question of fact to be resolved by the Commission, and its resolution of the issue will not be disturbed by a reviewing court unless it is against the manifest weight of the evidence. *Ameritech Services, Inc. v. Illinois Workers' Comp. Comm'n*, 389 Ill. App. 3d 191, 203 (2009) (citing *Ceco Corp. v. Industrial Comm'n*, 95 Ill. 2d 278, 288-89 (1983)). Although odd-lot cases involve a burden-shifting analysis, "[w]hether the parties satisfy their respective burdens are questions of fact." *City of Chicago v. Illinois Workers' Comp. Comm'n*, 373 Ill. App. 3d 1080, 1093 (2007). Thus, "[w]hether a claimant falls into the odd-lot category is a factual determination to be made by the Commission, and that determination will not be set aside unless it is against the manifest weight of the evidence." *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 544 (2007). It is the function of the Commission to decide questions of fact, judge the credibility of witnesses, and resolve conflicting medical evidence. *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253 (1980). "For a finding of fact to be against the manifest weight of the evidence, a conclusion opposite to the one reached by the

Commission must be clearly apparent." *Adcock v. Illinois Workers' Comp. Comm'n*, 2015 IL App (2d) 130884WC, ¶ 29. With these principles in mind, we consider whether the Commission's determination that claimant failed to prove his entitlement to PTD benefits under the odd-lot theory was against the manifest weight of the evidence.

¶ 51                                   B. PTD Benefits

¶ 52    Where, as here, a claimant's disability is limited in nature so that he is not obviously unemployable and there is no medical evidence supporting a claim of total disability, the claimant may prove entitlement to PTD benefits if he establishes by a preponderance of the evidence that he falls within the "odd-lot" category. *Westin Hotel*, 372 Ill. App. 3d at 544. A claimant may fall into the odd-lot category if he "is unable to perform services except those that are so limited in quantity, dependability, or quality that there is no reasonably stable market for them." *Id.* at 544. (citing *Alano v. Industrial Comm'n*, 282 Ill. App. 3d 531, 534 (1996)). A claimant generally satisfies the burden of establishing that he falls into the odd-lot category in one of the following ways: (1) by showing a diligent but unsuccessful job search, or (2) by demonstrating that he will not be regularly employed in a well-known branch of the labor market due to his age, skills, training, and work history. *Westin Hotel*, 372 Ill. App. 3d at 544 (citing *Alano*, 282 Ill. App. 3d at 534-35). If the claimant establishes that he falls into the odd-lot category, "the burden shifts to the employer to prove that the claimant is employable in a stable labor market and that such a market exists." *Westin Hotel*, 372 Ill. App. 3d at 544 (citing *Waldorf Corp. v. Industrial Comm'n*, 303 Ill. App. 3d 477, 484 (1999)).

¶ 53    Here, the Commission first found that claimant failed to prove he fell into the odd-lot category by showing he conducted a diligent but unsuccessful job search. Claimant does not dispute, and the evidence of record supports, the Commission's finding in this regard. Claimant,

instead, disputes the Commission's finding that he failed to prove he fell into the odd-lot category by demonstrating there were no available jobs for a person of his age, training, education and work history. Specifically, he argues that Helma's opinions, as set forth in her unrebutted report, were sufficient to establish there were no available jobs for a person in his circumstance. We agree.

¶ 54    In finding that claimant failed to prove he fell into the second odd-lot category, the Commission, unlike the arbitrator and circuit court, rejected Helma's opinions, finding her report "unpersuasive" and "confusing." Although the Commission was not required to accept Helma's opinions simply because AC did not offer opinions of a vocational rehabilitation expert, we note that the Commission may not arbitrarily reject uncontradicted testimony or evidence. *Sorenson v. Industrial Comm'n*, 281 Ill. App. 3d 373, 384 (1996). Where, as here, the Commission provides reasons for rejecting the arbitrator's credibility determination, a reviewing court considers whether those findings are against the manifest weight of the evidence. *R & D Thiel v. Illinois Workers' Comp. Comm'n*, 398 Ill. App. 3d 858, 866 (2010). Based on our review of the record, we conclude that the Commission arbitrarily rejected Helma's opinions and made findings that were against the manifest weight of the evidence.

¶ 55    The Commission first found Helma's opinions unpersuasive because her report was based on a single telephone interview with no evaluation of claimant's personal presentation. While Helma acknowledged in her report that she did not personally evaluate claimant, her report clearly demonstrates that her opinions were based on a thorough review of claimant's medical records, the opinions of Dr. Burton, along with information claimant provided during the telephone interview. We find it significant that the Commission did not find that Helma's opinions were based on incorrect information or that claimant lacked credibility. In fact, the Commission relied on the opinions of Dr. Burton and Helma in awarding claimant PPD benefits. Moreover, AC did

not introduce the report or testimony of a vocational rehabilitation expert to rebut Helma's opinions or to otherwise show that Helma was unable to formulate her opinions without evaluating claimant's personal presentation.

¶ 56    The Commission also found Helma's opinions confusing because her report indicated that claimant had "no transferable skills, and that sedentary, unskilled occupations comprise of 1% of the labor market" but also noted claimant's "extensive history of skilled work, not all of which encompass heavy duty work." After carefully reviewing Helma's report in the context of the entire record, as discussed below, we cannot say that her opinions are confusing.

¶ 57    We begin by noting that the Commission, in relying on the opinions of Dr. Burton and Helma in support of its PPD award, apparently agreed that, due to his current condition, claimant was unable to return "to his previous level of activity and previous job" at AC, which Helma classified at the medium level of physical demand. In her report, Helma concluded that claimant's current physical limitations and recommended work restrictions most closely correlated with sedentary types of employment, which comprised approximately 11% of the labor market. Helma explained, however, that the majority of sedentary types of employment were classified at the skilled to highly skilled level, while unskilled sedentary types of employment comprised approximately 1% of the labor market.

¶ 58    Helma noted that claimant's advanced age, limited education and lack of experience with computers would negatively impact his ability to transition into sedentary employment. In considering claimant's work history and transferrable skills, Helma observed that claimant's previous job duties resembled those of a truck driver, industrial truck operator, machine operator, general farmworker and construction worker. Helma indicated that those positions were classified as either semi-skilled or unskilled with either a medium or heavy level of physical demand.

Although claimant's most recent job as a set-up mechanic was classified as a skilled position, the skill set claimant developed in that position similarly involved a medium level of physical demand. As such, Helma reasonably concluded that the skills claimant had acquired from his past work experience would likely not transfer to the sedentary types of employment classified at the skilled to highly skilled level, leaving claimant with the unskilled sedentary types of employment that comprised only 1% of the labor market. Helma reasoned that claimant would have added difficulty obtaining unskilled sedentary employment because he lives in a rural area with limited employment options. After thoroughly considering these factors, Helma opined that claimant had lost access to a stable job market.

¶ 59 Based on our review of Helma's report, we conclude that the Commission erred by rejecting Helma's opinions as "unpersuasive" and "confusing." We find her opinions persuasive, easily discernable and consistent with additional evidence presented at the hearing, including claimant's testimony, medical records, SSA documentation, as well as the medical opinions of Dr. Burton. As noted, AC did not attempt to rebut Helma's opinions by introducing the testimony or report of its own vocational rehabilitation expert. We, therefore, conclude that the Commission arbitrarily rejected Helma's unrebutted opinions in finding claimant failed to prove entitlement to PTD benefits under the odd-lot theory. See *Adcock*, 2015 IL App (2d) 130884WC, ¶ 29. ("Although we are reluctant to disturb a factual determination made by the Commission, we will not hesitate to do so when the clearly evident, plain, and undisputable weight of the evidence compels an opposite conclusion.").

¶ 60 After considering Helma's opinions, we find that claimant presented sufficient evidence to meet his burden of establishing that he fell into the second odd-lot category. Because AC failed to present evidence showing that suitable work is regularly available to claimant, we hold that the

Commission's determination that claimant failed to prove his entitlement to PTD benefits was against the manifest weight of the evidence.

¶ 61                                III. Conclusion

¶ 62    For the foregoing reasons, we affirm the judgment of the circuit court of Winnebago County which set aside the Commission's decision and reinstated the arbitrator's decision.

¶ 63    Affirmed.